775 So.2d 1022 (2000)
STATE of Louisiana
v.
James Michael CASEY.
No. 99-KA-0023.
Supreme Court of Louisiana.
January 26, 2000.
Rehearing Denied March 17, 2000.
*1026 Lawrence M. Johnson, John Michael Lawrence, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, James M. Bullers, District Attorney, Whitley Robert Graves, Benton, Counsel for Respondent.
KIMBALL, Justice.[*]
On May 28, 1998, a jury convicted the defendant, James Michael Casey, of the first degree murder of Christina Wolfe. One day later, after the penalty phase hearing, the jury unanimously determined that the defendant should receive the death penalty. The defendant was subsequently sentenced to death by the trial judge in accordance with the jury's recommendation. Pursuant to La. Const. art. V, § 5(D), the defendant appeals his conviction and sentence arguing fifteen assignments of error and one supplemental assignment of error.[2]

FACTS
On the night of May 24, 1996, twelve-year-old Christina (Christy) Wolfe, invited her best friend, Christina Casey, to spend the night at her apartment, located at the Park Place Apartments in Bossier City. Christina Casey lived in the same apartment complex. After returning from inviting her friend to spend the night, Christy Wolfe, clad in a bikini top and shorts, told her mother, Cheryl Wolfe, that Christina's father, United States Air Force Sergeant James Casey, made suggestive comments to her earlier that day about her apparel and pinched her on the buttocks. When Cheryl Wolfe went to James Casey's apartment later that evening to lend him a videotape and some money, she did not mention the incident.
During the early morning hours of May 25, 1996, the defendant walked past the Wolfes' apartment and saw the two girls smoking cigarettes through the open bedroom window, which was open because of the heat and the fact that the air conditioner was out of order. The defendant, from the outside, ordered his daughter home. After returning to his apartment and chastising his daughter for smoking, the defendant returned to the Wolfes' apartment at approximately 2:25 a.m. Cheryl Wolfe, asleep on the living room sofa, testified at trial that she awoke to find defendant standing in her open doorway. Defendant, who appeared drunk, told Cheryl Wolfe that he had caught the girls smoking, sent his daughter home and told her she was no longer allowed to see Christy Wolfe. Cheryl Wolfe further testified that after defendant left, she checked on Christy Wolfe, who was awake and unharmed, and talked *1027 to her about the smoking incident. Cheryl Wolfe then went back to sleep in the living room. Upon awakening later that morning, Cheryl Wolfe went into Christy's room and found her naked and dead underneath a blanket on her bed.
Upon arrival at the scene, the police conducted an extensive search of the bedroom, but were hampered in their investigation due to the complete disarray and unsanitary conditions that existed in the apartment. However, they did discover two sweat-like patterns on the bed mattress, one under Christy's body and one next to her body. The police also found a wad of used tape with large amounts of hair attached to it hidden inside a sweater in a dresser drawer near the foot of the bed. The wad of tape, six feet long when unwrapped, was examined and the hair on it matched that of Christy Wolfe. The coroner determined that the tape had been used as a ligature to strangle Christy Wolfe as the twisting in the tape matched the bruise marks on the girl's neck. The tape was a type only sold commercially to moving companies and had been sold to a company in South Carolina, where the defendant had been stationed three years earlier, that was under contract to the United States Air Force to pack and move air force personnel. The tape was sent to the FBI laboratory for fingerprint analysis where two full thumb prints were uncovered near the end of the tape. These fingerprints were later matched to the right and left thumb prints of the defendant.
Although no conclusive sign of rape was detected, seminal fluid, without sperm, was discovered in Christy Wolfe's vaginal and anal areas as well as in her nasal passages. As the seminal fluid did not contain sperm, a DNA analysis was impossible. During their investigation the police learned from defendant's ex-wife that he had undergone a vasectomy during the course of their marriage. Further, the ex-wife recognized the tape as being similar to the type used by the moving company in South Carolina, and Christina Casey told the police that several boxes with similar tape on them were in her father's apartment at the time Christy Wolfe was murdered.
On January 31, 1997, the Bossier Parish police arrested James Casey at his apartment and executed a search warrant. The state subsequently indicted him on one count of first degree murder. After the trial, begun May 18, 1998, a unanimous jury found the defendant guilty as charged. After finding the presence of two aggravating circumstances,[3] the same jury, again unanimously, determined that defendant should receive the death penalty. A sentence of death was subsequently imposed by the trial court.

LAW AND DISCUSSION

Assignments of Error Nos. 3 and 13
In his third and thirteenth assignments of error, the defendant argues that the trial court erred in denying his motion to suppress clothing, packing tape, five cardboard boxes, other personal items seized during the search of his apartment and the return on the search warrant. The defendant argues specifically that the information contained in the affidavit in support of the search warrant was stale in that it was based on information three years old and contained erroneous information.
A person is constitutionally protected against unreasonable search and seizure of his house, papers and effects. Thus, a search and seizure of such shall only be made upon a warrant issued on probable cause, supported by oath or affirmation, and particularly describing the place to be searched and thing(s) to be seized. U.S. Const. amend. IV; La. Const. art. I, § 5 (1974). The general rule is that probable cause sufficient to issue a search *1028 warrant "exists when the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that an offense has been committed and that evidence or contraband may be found at the place to be searched." La.C.Cr. P. art. 162; State v. Johnson, 408 So.2d 1280, 1283 (La.1982). The issuing magistrate must make a practical, common sense decision whether, given all the circumstances set forth in the affidavit, a fair probability exists that the evidence of a crime will be found in a particular place. State v. Byrd, 568 So.2d 554, 559 (La.1990). Additionally, a search warrant must establish a probable continuing nexus between the place sought to be searched and the property sought to be seized. State v. Weinberg, 364 So.2d 964, 968 (La.1978). Further, an affidavit must contain, within its four corners, the facts establishing the existence of probable cause for issuing the warrant. State v. Duncan, 420 So.2d 1105, 1108 (La.1982).
In this case, the affidavit in support of the warrant contained, in full, the following statements of fact:
On May 25, 1996 Christine [sic] Wolfe was found dead in her apartment located at 400 John Wesley Blvd., Apartment 131, Bossier City, Bossier Parish, Louisiana. The investigation showed that Christine [sic] Wolfe died due to hypoxia due to ligature strangulation.
During the search of the murder scene, a quantity of tape was found which had human hair on it which was later determined to be microscopically similar to the hair of Christine [sic] Wolfe and probably originated from her. Further investigation determined that the marks on Christine [sic] Wolfe's neck were consistent with markings which would have been produced by the tape.
Two fingerprints were found on the tape taken from the apartment which were determined to be from James M. Casey.
The tape was determined to be a tape not normally sold retail but used by commercial establishments. Further investigation showed that James Casey moved from Shaw, South Carolina and subsequently to Bossier City and that the company that was used by James Casey to move from Shaw, South Carolina used the same type tape found at the scene of Christine [sic] Wolfe's murder.
James Casey lives in 400 John Wesley Blvd., Apartment 149, and was living there on May 25, 1996. James Casey's former wife advised the officers that at least two boxes existed inside Apartment 149 when she moved away which were packed by the moving company in South Carolina which used the same type tape as found at Christine [sic] Wolfe's murder scene bearing the hair and finger prints [sic] stated above.
A warrant may become stale if facts and circumstances at the time of its execution show that probable cause no longer exists. State v. Ogden, 391 So.2d 434, 437 (La.1980) (citing State v. Gilbert, 354 So.2d 508, 513 (La.1978)). Thus, "staleness is only an issue when the passage of time makes it doubtful that the object sought in the warrant will be at the place where it was observed." State v. Tate, 407 So.2d 1133, 1137 (La.1981). The defendant argues that the information in the last paragraph of the affidavit is stale. Specifically, he contends that the events in South Carolina concerning the moving company occurred three years before the warrant was issued, and the warrant contains erroneous information.[4] Defendant *1029 extends his argument to further allege that the affiant intentionally misrepresented the facts in order to avoid the issue of staleness. For an affiant to make a material and intentional misrepresentation to a magistrate constitutes a fraud upon the court and will result in the invalidation of the warrant and suppression of the items seized. Byrd, 568 So.2d at 559; State v. Williams, 448 So.2d 659, 663 (La.1984). However, if the misrepresentations or omissions are inadvertent or negligent, the correct procedure is for the warrant to be retested for probable cause after supplying that which was omitted or striking that which was misrepresented. Byrd, 568 So.2d at 559; State v. Lehnen, 403 So.2d 683, 686 (La.1981).
On the record in this case, we cannot draw the inference that the affiant intentionally misled the issuing magistrate. The defense is correct that information that tends to dilute the probable cause showing was omitted from the affidavit. First, the way the affidavit reads implies that the defendant's ex-wife lived in the referenced apartment with him, which she never did. Second, the move from South Carolina referred to in the warrant occurred three years before the date of the application of the warrant. Finally, the defendant's daughter, according to the police report, is the person who told the police that the boxes with similar tape, which had never been unpacked due to limited space, were still present at the defendant's apartment seven months prior to the date of the issuance of the warrant. A fair reading of the record lends support to the conclusion that the misrepresentation in the affidavit is an obvious conflation of different statements from two separate people. At the motion to suppress hearing, these same arguments were made by the defendant and the trial court made the implicit determination that the omissions were unintentional. The trial court's factual findings during a hearing to suppress evidence are entitled to great weight and should not be disturbed unless they are clearly erroneous. State v. Clark, 446 So.2d 293, 297 (La.1984). On review, this court finds no reason to disturb the factual finding by the trial court that the omission in the affidavit reflected inadvertent negligence and not intentional fraud.
The court must, therefore, retest the warrant for probable cause adding the information that the move from South Carolina occurred three years before the date the warrant issued and the defendant's daughter, not ex-wife, saw the boxes in the apartment. Even though the affidavit is weakened with the addition of this unintentionally omitted information, the omitted facts have little bearing on the core of the probable cause showing. We are still left with the facts that the defendant's fingerprints were found on the murder weapon, the tape was a type used only for commercial purposes and the defendant was associated at some time with a moving company that used that type of *1030 tape. These facts are sufficient in themselves to support a reasonable belief that an offense had been committed and that evidence of a crime might be found in the defendant's home. Byrd, 568 So.2d at 560; Johnson, 408 So.2d at 1283; see also Williams, 448 So.2d at 663 (holding "the fingerprint match alone supplies probable causes for defendant's arrest"). Although the probable cause showing in this case could have been better (see note 3, supra), "the fact that a better showing of probable cause could be made by the affiant does not detract from the showing of probable cause that is made." Williams, 448 So.2d at 663 (citing State v. Rodrigue, 437 So.2d 830 (La.1983)). In many cases, the nature of the crime makes it appropriate to assume the instrumentalities of the offense are probably stored in the suspect's residence. State v. Varnado, 95-3127, p. 2 (La.5/31/96), 675 So.2d 268, 270 (citing State v. Poree, 406 So.2d 546, 547-48 (La. 1981)). In fact, "where the object of the search is a weapon used in the crime or clothing worn at the time of the crime, the inference that the items are at the offender's residence is especially compelling." 2 Wayne L. LaFave, Search and Seizure, § 3.7(d), at 384 (3d ed. 1996). In this case, the nature of the crime, a strangulation using a six foot piece of packing tape as a ligature, with both of the defendant's thumb prints on that tape, makes it appropriate to assume that the instrumentality, the roll of packing tape, would be stored in his home. Thus, the affidavit recited sufficient facts to establish probable cause for the issuance of a search warrant. Hence, the trial judge did not err in denying the defendant's motion to suppress the items seized in that search.

Assignment of Error No. 4
In his fourth assignment of error, the defendant claims that the trial court erred by not admitting into evidence Defense Exhibit No. 26, a police incident report concerning obscene phone calls allegedly made by defense witness, Randy Boddie. Boddie had a relationship with the Wolfes and was, as he describes it, a father figure to Christy, who lived with him for several weeks before her death. Boddie is also, according to the defense, a pedophile and the most likely alternative suspect in the victim's murder.
To establish Boddie's pedophilic tendencies, the defense called him to the stand and questioned him concerning reports of obscene telephone calls that he allegedly made to a female clerk at the Sundowner Motel in an attempt to rent a room for purposes of photographing an eleven year old girl in the nude. The defendant claims that at trial Boddie denied some of the allegations contained in the police report and attempted to offer an innocent explanation. Consequently, the defendant contends that the police report should have been admitted into evidence to impeach Boddie's testimony. The defendant argues that the trial court's ruling, excluding the incident report, but allowing the defense to proffer the report for appellate review, interfered with his right to present a defense.[5] Specifically, the defendant claims that the ruling prohibited him from demonstrating to the jury that Randy Boddie, and not he, murdered Christy Wolfe.
The Sixth Amendment to the United States Constitution guarantees the right of the accused in a criminal prosecution "to be confronted with the witnesses against him." Additionally, the confrontation clause of the Louisiana Constitution directly affords the accused the right to "confront and cross-examine the witness against him." La. Const. art. I, § 16. In this case, Boddie appeared as a defense witness, but La. C.E. art. 607(A), specifically provides that "the credibility of a witness may be attacked by any party, including the party calling him." The comments to La.C.E. art. 607(A) note that the article made significant changes to *1031 Louisiana law, which had previously followed the common-law rule prohibiting a party from impeaching his own witness. See Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("[W]hatever the validity the rule [which seized on the presumptionwithout regard to the circumstances of the particular casethat a party who calls a witness `vouches for his credibility'] may have once enjoyed, and apart from whatever usefulness it returns today in the civil trial process, it bears little relationship to the realities of the criminal process.") (footnote omitted). Nevertheless, while the change in the law allows such impeachment, the comments to art. 607(A) observe that "[a]buse of this provision should be prevented by the exercise of judicial discretion. For example, the court should prohibit a party's attacking the credibility of his own witness when it is clear that he is doing so primarily with the intention or effect of adducing otherwise inadmissible evidence, typically a prior inconsistent statement on the pretext of attacking credibility." Further, well before the occurrence of this change in Louisiana law, Justice Tate cautioned against allowing a party to call a witness solely for purposes of demolishing the witness's credibility before the jury:
Since the sole purpose of admitting prior inconsistent statements is to test the credibility of the witness, it is fundamentally illogical to permit a party to call a hostile witness to testify to a statement, for the sole purpose of impeaching the credibility of that expectedly hostile witness by showing some prior inconsistent statement. The apparent reason for calling the witness or questioning him on the subject of the prior statement must be to get before the jury such prior inconsistent statement, with its obviously prejudicial effect on the issue of the substantive guilt or innocence.
A party should not be able to call a witness to evoke a statement which the party intends to dispute by the prior statement for the sole purpose of getting before a jury inadmissible hearsay testimony (ostensibly offered only to prove that the witness is lying as indeed the party who called him knew in advance he would). See Pugh, 22 La.L.Rev. 397-398 (1962).
State v. Rossi, 273 So.2d 265, 270 (La.1973) (Tate, J., concurring).
In this case, the defendant sought to introduce a police incident report to attack Boddie's truthfulness concerning the phone calls to the Sundowner. A police incident report is hearsay and is specifically excluded from the public records exception to the hearsay rule. La. C.E. art. 803(8)(b)(i). Further, only offenses for which a witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal. La. C.E. art. 609.1 B. Thus, extrinsic evidence of complaints made against Boddie by the clerk at the Sundowner Motel were inadmissible for impeachment of the witness's general credibility under the general hearsay rule and under articles 608 B and 609.1 B because they did not involve a conviction.
Moreover, defense counsel was allowed to explore on direct examination all of the allegations made by the motel clerk in the incident report[6] and read numerous portions *1032 of the report to the witness in an attempt to impeach him. Additionally, the probative value of the incident is tangential at best. First, the incident took place seven years earlier and did not result in an arrest. Second, Boddie testified that he does not have a niece named Kathy, nor did he ever make inquiries relative to pictures of young girls. Finally, Boddie did not know either the victim or her mother at the time the calls were made.
In the present case, the trial court gave counsel wide latitude in questioning Boddie about the Sundowner Motel incident. However, the trial court properly disallowed the introduction of the police report, which was clearly offered by the defense for its substantive, assertive content regarding the truth of allegations made by the motel clerk. No abuse of the court's discretion appears on the present record, as the incident clearly lacked the overwhelming probative force of the extrajudicial confession of the witness in Chambers, which held that under the particular circumstances of the case, state evidentiary rules had to give way to the defendant's constitutional right to present a defense. 410 U.S. at 300-03, 93 S.Ct. at 1048-49. Even construed in the light most favorable to the defense, Boddie's involvement with the Sundowner Motel had only marginal relevance in a case that rested on evidence that the defendant's fingerprints were found on the murder weapon, that he was one of the last people to see the victim, that he made sexually explicit remarks to her on the day of her murder, and that he has undergone a vasectomy, a crucial piece of evidence used to explain why the seminal fluid in the victim's vaginal and nasal cavities contained no sperm. Further, defense counsel's examination of Boddie thoroughly alerted jurors to the details of the Sundowner Motel incident. Thus, under these circumstances, the trial court did not err in excluding the police incident report.

Supplemental Assignment of Error
In his supplemental assignment of error, the defendant argues that the trial court erred by permitting his daughter, Christina Casey, to testify as to her opinion on whether the victim, Christy Wolfe, would have informed her that she was sexually active. The defendant's contention is that the testimony constituted inadmissible opinion testimony and contradicted the defense theory of the case, which was that Randy Boddie had a motive to kill Christy Wolfe because he had transmitted a venereal disease to her and she, being *1033 underage, had threatened to notify the police.
The general rule is that a lay witness is permitted to draw reasonable inferences from his or her personal observations. State v. Vanderhoff, 415 So.2d 190, 194 (La.1982) (citing State v. Sayles, 395 So.2d 695 (La.1981)). This court has held that "the opinion rule [La. R.S. 15:463] should not be applied so strictly as to exclude firsthand testimony that may be several inferences removed from raw sense perceptions, yet more helpful to the jury than mere recitation of such perceptions." State v. Short, 368 So.2d 1078, 1081 (La.1979). Thus, if the testimony constitutes a natural inference from what was observed, no prohibition against it as the opinion of a non-expert exists as long as the lay witness states the observed facts as well. State v. Roche, 341 So.2d 348, 352 (La.1976) (citing State v. Maines, 183 La. 499, 164 So. 321 (1935); State v. Willis, 181 La. 154, 158 So. 826 (1935)). Therefore, the reviewing court must ask two pertinent questions to determine whether the trial court properly allowed such testimony: (1) was the testimony speculative opinion evidence or simply a recitation of or inferences from fact based upon the witness's observations; and (2) if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error. See State v. Alexander, 430 So.2d 621, 624 (La.1983).
Thus, first we must ask whether Christina Casey's testimony that her best friend Christy Wolfe would have told her if she was engaged in sexual activity constitutes a speculative opinion by the girl or simply an inference from fact based upon her observations. Christina Casey testified that she and Christy Wolfe were "best friends" and that they spent many hours together, which included spending the night at each other's homes on numerous occasions. In fact, Christina Casey also visited Christy Wolfe when Christy was staying at Randy Boddie's home. She further testified that she and Christy Wolfe confided in each other about school, friends and the boys they liked or who liked them. Thus, her testimony that Christy Wolfe would have told her if she had, or was having, sex is not a speculative opinion, but a natural inference that she drew based on her observations, to which she testified, of the closeness of their relationship. Hence, the trial court did not err in permitting the testimony.
However, even if one assumes that the evidence was improperly admitted, the next question for the reviewing court is whether the testimony was so prejudicial to the defense as to constitute reversible error. Erroneous admission of evidence requires reversal only where there is a reasonable possibility that the evidence might have contributed to the verdict. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Gibson, 391 So.2d 421 (La.1980). The relevant inquiry is whether the reviewing court may conclude the error was harmless beyond a reasonable doubt, Chapman, supra, i.e. was the guilty verdict actually rendered unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
In addition to the testimony of Christina Casey that Christy Wolfe was not engaging in sexual activity at the time of her death, the state also presented the factual testimony of Dr. McCormick, who performed the autopsy on the victim. He testified that he found no indication of any other sexual activity at or near the time of her death. In light of Dr. McCormick's testimony then, the jury's verdict was surely unattributable to the testimony of Christina Casey, if improperly admitted. Thus, even assuming that the testimony of Christina Casey was improper, its admission constitutes harmless error beyond a reasonable doubt.

Assignment of Error No. 6
In his sixth assignment of error, the defendant argues that the trial court *1034 erred by not granting his motion for a post-verdict judgment of acquittal that alleged the evidence presented at trial was insufficient to sustain a conviction. The defendant contends that the circumstantial evidence presented by the State did not exclude every other reasonable hypothesis of innocence. Specifically, the defendant points to the alternate theory that the evidence shows that Randy Boddie, whom the defense alleges was engaged in sexual activity with Christy Wolfe, had reason to fear that she would inform the police of their illegal relationship. Further, defendant alleges that Randy Boddie was paying past due rent and telephone bills for Cheryl Wolfe and was in turn permitted access by her to her daughter in furtherance of his pedophilic activities. Further, Cheryl Wolfe permitted her daughter to live with Randy Boddie for several weeks and granted him access to and supervision of Christy Wolfe. Two weeks before her death, Christy Wolfe had an incident with Randy Boddie where she returned home from living with him for several days claiming he pinned her to the wall. The police report and trial testimony indicated that as a result of this encounter she said that she did not want Boddie to be her "daddy" anymore. The defense alleges that the fact that Randy Boddie is a pedophile was proven when he admitted making obscene telephone calls to a female clerk at the Sundowner Motel in Bossier City and discussed renting a room to take nude photographs of a "juvenile female relative."
In reviewing the sufficiency of the evidence to support a conviction, the reviewing court must determine if the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La.1984). The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Mussall, 523 So.2d 1305, 1310 (La.1988). In cases where the conviction is based on circumstantial evidence, La. R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. State v. Camp, 446 So.2d 1207, 1209 (La. 1984); State v. Wright, 445 So.2d 1198, 1201 (La.1984). However, La. R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula. State v. Porretto, 468 So.2d 1142, 1146 (La.1985).
At trial, the State presented evidence that the defendant's fingerprints were lifted from the murder weapon; i.e., a six foot long piece of packing tape found at the scene of the crime with the victim's hair wound up in it. Moreover, one of the defendant's thumb prints was positioned at the end of the tape where it appeared to have been ripped from the roll. An FBI fingerprint expert testified that it would be impossible for anyone to leave that print accidently, and, in his opinion, the print could have only been left by the person who unrolled the six feet of tape used to strangle Christy Wolfe. In addition, the State established that the tape was a type not sold to the general public, but only to commercial companies. Further, the commercial moving company that had packed and moved the defendant's belongings three years earlier had used that type of tape. Finally, the State also established that seminal fluid, which contained no sperm, was found in Christy Wolfe's anal, vaginal and nasal areas. According to the medical testimony at trial, this absence of sperm in seminal fluid only occurs in pre-ejaculatory fluid, that is, in cases where a man does not climax, or in men who have had vasectomies. The State established that the defendant underwent a successful vasectomy surgery in February *1035 1987. In addition, when confronted with this evidence by the police, the defendant responded by stating, "I don't know how to confess to you. If I had done it I wouldn't be able touhif [I] had killed her [I] would have a hard time confessing because of [my] mother, daughter and God not being able to forgive [me]."
In this case, the defendant presents a plethora of other suspects and scenarios to explain Christy Wolfe's murder, but fails to produce a scintilla of direct evidence linking any of these people to the crime. The jury heard Cheryl Wolfe testify that she was a heavy sleeper and did not hear an intruder that night. The jury also heard Randy Boddie's testimony, which included an attempt to explain the phone calls to Sundowner Motel as being foolish pranks he engaged in when he was younger. Further, he denied ever being involved sexually with any child or even suggesting sexual activities with children during the calls. Further, he contradicted the defense's contention that he had a venereal disease that he passed to Christy Wolfe stating that the antibiotics in his name that were found at the scene of the crime were for acne. He also testified that he had not had a vasectomy and that, to his knowledge, no problem with his sperm existed in which he would produce seminal fluid without sperm.
Therefore, the jury in this case made a rational credibility determination and obviously found all of the defense's far-fetched theories unconvincing.[7]Mussall, 523 So.2d at 1311. Further, the evidence presented by the prosecution was sufficient to convince a rational trier of fact that all the elements of the crime had been proven beyond a reasonable doubt. Thus, this assignment of error lacks merit.

Assignments of Error Nos. 8 and 9
In his eighth and ninth assignments of error, the defendant argues that the trial court erred by allowing improper closing arguments by the prosecution. First,[8] the defendant argues that the prosecutor made several objectionable remarks referring to serial killers Wayne Williams and Ted Bundy and comparing them with the defendant and the manner of death as alleged by the State.[9] Second, the defendant *1036 complains about the prosecutor's comments that, "the state's evidence is better than a 12-year-old coming back from the grave" and "the victim is not here to tell you the elements of rape."[10]
The general rule concerning the scope of closing arguments is that they are confined to "evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case." La.C.Cr. P. art. 774. Louisiana jurisprudence on prosecutorial misconduct allows prosecutors wide latitude in choosing closing argument tactics. See State v. Martin, 539 So.2d 1235, 1240 (La.1989) (holding closing arguments that referred to "smoke screen" tactics and defense as "commie pinkos" inarticulate but not improper); State v. Copeland, 530 So.2d 526, 545 (La.1988) (holding prosecutor's waving gruesome photo at jury and urging members to look at it if they became "weak kneed" during deliberations as not improper). Further, the trial judge has broad discretion in controlling the scope of closing arguments. State v. Prestridge, 399 So.2d 564, 580 (La.1981). And, even if the prosecutor exceeds these bounds, the court will not reverse a conviction unless "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. See State v. Martin, 93-0285, p. 17 (La.10/17/94), 645 So.2d 190, 200; State v. Jarman, 445 So.2d 1184, 1188 (La.1984); State v. Dupre, 408 So.2d 1229, 1234 (La. 1982).
Even if we were to assume that the prosecutor's comments in this case were outside the proper scope of closing arguments, the defendant is still not entitled to relief. The court must be thoroughly convinced that the argument influenced the jury and contributed to the verdict before reversing a conviction based on misconduct during the closing arguments. The thrust of the prosecutor's remarks were, in the first instance, to downplay the importance of hair and fiber evidence in this case to counter the defense's position that it was crucial, and, in the second instance, to emphasize the importance of the fingerprint matches on the murder weapon to counter the defense's position that it was accidental. The verdict was unanimous and it was reasonable on the basis of the evidence heard. In fact, "credit should be accorded to the good sense and fair-mindedness of jurors who have heard the evidence." Jarman, 445 So.2d at 1188. In this case, the defendant was convicted based on ample evidence of guilt, including the absence of sperm in the seminal fluid found in the victim's anal, vaginal and nasal passages coupled with the fact of the defendant's successful vasectomy, Cheryl Wolfe's testimony, the roll of packing tape found in the defendant's apartment and the defendant's fingerprints on the murder weapon itself. Thus, the court is not thoroughly convinced that the closing argument, even if improper, influenced the jury and contributed to the verdict such *1037 that the defendant warrants a reversal of his conviction.

Assignment of Error No. 11
In his eleventh assignment of error, the defendant claims that the trial court impermissibly curtailed his right to present a defense by limiting the portions of the crime scene video shown to the jury. At trial, the defense requested the video be shown in its entirety to demonstrate that the victim's apartment was so cluttered that anyone trying to get around it in the dark could not possibly do so without making a substantial amount of noise. The State claimed that the only reason the defense wished to enter the entire videotape was to malign the victim's mother and characterize the family as "trashy." The trial judge allowed an edited version of the video tape into evidence, which showed the living room and bedroom of the victim's apartment, but not the kitchen, bathroom or second bedroom.
A criminal defendant has a constitutional right to present a defense. La. Const. art. I, § 16. To this end, a defendant should be allowed to present evidence on any relevant matter. State v. Shoemaker, 500 So.2d 385 (La.1987). However, the right to present a defense is not without limits and the state retains a legitimate interest in barring unreliable evidence from criminal trials. Rock v. Arkansas, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).
In the case of photographic evidence, any photograph that illustrates any fact, sheds light upon any factor at issue in the case, or reliably represents the person, place or thing depicted is admissible, provided its probative value outweighs any prejudicial effect. State v. Lindsey, 404 So.2d 466, 475 (La.1981). The same rule applies to the introduction of videotape. State v. Davis, 92-1623, p. 23 (La.5/23/94), 637 So.2d 1012, 1026; see State v. Garrison, 400 So.2d 874, 880 (La.1981). Further, the trial court's ruling on the admissibility of evidence, whether photographic or video, will generally not be disturbed on appeal unless the prejudicial effect of the evidence outweighs its probative value. Davis, 92-1623, p. 24, 637 So.2d at 1026
Clearly, a depiction of the crime scene is relevant and probative. However, the portions of the videotape that recorded the bathroom and kitchen, parts edited out by the trial court, were not relevant to the crime itself. No evidence was presented during trial to suggest the killer ever entered either of those rooms or had to pass through them to get to the victim. Thus, the trial court did not err in editing those portions of the tape.
However, the portion of the tape that depicted the second bedroom was relevant to the defense. Specifically, that portion of the tape showed a large amount of debris, garbage and clothing overflowing out of the room itself and into the hallway leading to the victim's bedroom. As the defendant points out, this debris would have made a silent entry into the victim's bedroom in the middle of the night extremely difficult. Thus, this portion of the videotape was relevant to the defense theory of the case, which was that the victim's mother and/or one of her boyfriends participated in the crime. Thus, the trial court erred by excluding this portion of the videotape.
Nevertheless, the error is subject to harmless-error analysis. In the context of a trial court ruling excluding defense evidence, the error may not be deemed harmless unless the reviewing court is "convinced that the excluded evidence would not have affected the jury's determination." State v. Vaughn, 431 So.2d 358, 371 n. 8 (La.1982) (citing Gibson, 391 So.2d at 426). In the defendant's case, although some relevant portions of the crime scene videotape were edited out by the trial court, the defense was still able to show the crime scene video, which certainly depicted the unsanitary conditions of the apartment, as well as numerous photographs of the apartment and a diagram of *1038 the scene. In addition, Sgt. Steven Becker, the crime scene technician, testified that, "[t]he conditions [of the apartment] were dirty. It was dusty. Everything was messed up. It was very hard to determine if anything had been touched because of the condition of the apartment. It was just cluttered." Additionally, on cross-examination, Sgt. Becker testified that "the problem with the videotape was getting around certain items" and that it would have been quite difficult to get around the apartment to videotape at night. Consequently, even without the edited portions of the videotape being allowed into evidence, the defense was able to raise doubt about the ability of an intruder to silently enter the house without alerting the victim's mother. Thus, we cannot conclude that the defendant was prejudiced by the exclusion of that small portion of the videotape at issue and we are convinced beyond a reasonable doubt that the error by trial court, if any, was harmless. See State v. Welcome, 458 So.2d 1235, 1243 (La.1984) (holding where excluded evidence would have been merely cumulative of evidence presented at trial, any error by the court in not admitting evidence is harmless).

Assignments of Error Nos. 1, 5, 10 and 12
In these assignments of error, the defendant contends that the trial court erred by not granting his motion for a new sentencing hearing. In the motion, the defendant alleged that the trial court erred by limiting the mitigation testimony of Dr. Mark Cunningham, a forensic psychologist, and by prohibiting the defense from questioning the defendant's two daughters before trial.
First, the defendant claims that the trial court's ruling as to Dr. Cunningham's testimony prohibited him from introducing evidence at the penalty phase about: (1) defendant's father and his alcoholism; (2) physical abuse of the defendant and sexual abuse of the defendant's sisters by his father in the defendant's presence; (3) sexual abuse of the defendant by an older person who was not a relative; and (4) other evidence about the defendant's life and his own alcohol abuse.[11]
The trial judge is vested with broad discretion in ruling on the scope of expert testimony. La. C.E. art. 702. Further, under La. C.Cr.P. art. 905.2 A, a capital sentencing hearing "shall be conducted according to the rules of evidence." La. C.E. art. 705(B) provides that in a criminal case, while every expert witness must state the basis for his conclusion, if the evidence is otherwise inadmissible it can only be brought out on cross-examination. Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801 C.
*1039 In this case, the majority of the information defense counsel sought to elicit from Dr. Cunningham was merely a retelling of facts obtained through the defendant's family concerning the family history. Such information is clearly hearsay and thus inadmissible. However, the defendant argues that his attorney called family members to the stand during the sentencing hearing to support the subsequent testimony by Dr. Cunningham and that his testimony did not, therefore, rely on hearsay. However, a thorough review of the record reveals that Dr. Cunningham did, in fact, discuss the defendant's family life including his father's alcoholism and physical abuse of the defendant and his siblings. Additionally, Dr. Cunningham testified substantially about the defendant's own alcoholism. Thus, the defendant's complaints in these areas are without merit. As for his contention that Dr. Cunningham was unfairly prohibited from presenting evidence of sexual abuse of the defendant and his siblings, the trial court's ruling was clearly correct. Nowhere in the record do the defendant's family members discuss any type of sexual abuse. Thus, any references to such abuse by Dr. Cunningham would clearly be based on hearsay and are, therefore, inadmissible.[12] Therefore, the trial court did not err in ruling such statements inadmissible.
Second, the defendant claims that the trial court erred by ruling that the defendant's counsel could not interview two of the State's witnesses, specifically, the defendant's children, before they testified in court. The defendant argues that his attorney's inability to interview his two daughters prior to trial inhibited his ability to prepare their testimony for the sentencing phase of the trial. The defendant claims he engaged a private investigator and attempts were made to interview the children who were living with their mother in Texas. However, these attempts were blocked by the children's mother. During the trial, defense counsel again tried to interview the children and made a motion in court requesting assistance in gaining access to them, which the court denied over defense's objection. The defendant now argues that the ruling of the court amounted to a violation of his right to have witnesses testify on his behalf.
This court has held that a witness is free to choose whether he or she speaks with opposing counsel and that determination shall be made by the witness alone, as long as the state does not deny the defense access to the witness. State v. Harris, 367 So.2d 322, 324 (La.1979) (citing State v. Hammler, 312 So.2d 306 (La.1975)). In Hammler, the prosecutor instructed two principal State witnesses not to speak to any attorneys for the defense and, as a result of those instructions, the witnesses refused to speak with one of the defense attorneys. In reversing the defendant's convictions, the court held that:
It is our opinion that the prosecuting attorney's conduct in advising the witnesses not to speak to defense attorneys significantly interfered with the defendants' constitutionally guaranteed right to effective counsel because their counsel were denied the opportunity to adequately prepare a defense.
312 So.2d at 309. By contrast, in the instant case, the defendant fails to establish, or even allege, that the witnesses were acting under the direction of the district attorney's office, as opposed to the direction of their mother, when they refused to speak with him. As with any witness, the two children had the choice to speak to defense counsel or not, and, as both were minors at time of trial, they *1040 were also subject to parental supervision in that regard. The defendant completely fails to demonstrate any error on the part of the trial court in refusing to order the witnesses to speak to the defendant's attorney. Thus, the trial court did not err in denying the defendant's motion to compel the witnesses to speak to defense counsel.
Thus, because the trial court did not err in ruling the statements of Dr. Cunningham at issue inadmissible, or in denying the defendant's motion to compel his two daughters to speak to defense counsel, defendant's assignments of error regarding the denial of his motion for a new sentencing hearing are without merit.

Assignments of Error Nos. 1, 10, and 15
In these assignments of error, the defendant claims that the State's evidence failed to support sufficient aggravating circumstances to warrant the death penalty. Specifically, the defendant argues that the State failed to present any additional evidence during the penalty phase of the trial that proved the existence of "torture" or the "pitiless infliction of unnecessary pain and suffering" other than strangulation by use of a ligature. The defendant also contends that the trial court erred when it failed to give a limiting instruction for the aggravating circumstance of "heinous, atrocious or cruel," leaving the jury with the State's "improper" definition of that aggravator, and thus, invalidating their finding of heinousness and vitiating his death sentence.
In State v. Sawyer, 422 So.2d 95, 101-02 (La.1982), this court held that the "adequately supported finding of the existence of one aggravating circumstance is alone sufficient to place defendant in that category of offenders properly exposed to the possibility of the death sentence." Further, La. C.Cr.P. art. 905.3 only requires that the jury find the existence of one aggravating circumstance in order to recommend a sentence of death. Id. at 101. Thus, in light of our conclusion that the jury had more than ample evidence to find the aggravating circumstance that the murder occurred during the course of an aggravated burglary and aggravated or forcible rape, we need not address the assignment of error the defendant alleges regarding the aggravating circumstance of heinousness. See Capital Sentence Review, aggravating circumstances, infra.

CAPITAL SENTENCE REVIEW
Under La. C.Cr.P. art. 905.9 and La. S.Ct.R. 28, this court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the district judge has submitted a Uniform Capital Sentence Report and the Department of Corrections has submitted a Capital Sentence Investigation Report. The defendant and the district attorney have both filed a Sentence Review Memorandum.
The Uniform Capital Sentence Report and the Capital Sentence Investigation Report indicate that the defendant is a white male, in good health, born on February 4, 1961. He was approximately thirty-five years old at the time of the offense. He was born in Albuquerque, New Mexico. He is the youngest of seven children and his family moved around a lot throughout his childhood due to his father's employment situation. At eighteen years old, the defendant married and joined the United States Air Force. Two daughters and one son were born of that marriage; two of these children are minors. The defendant was divorced in 1991 and was awarded custody of his middle child, Christina Casey.
The defendant claims both his mother and father, who is now deceased, abused *1041 alcohol. Further, his father physically abused him and his siblings. During his sixteen years of service in the United States Air Force, defendant did not experience any disciplinary problems. Further, he had no criminal record, either as a juvenile or adult, until his arrest for the murder of Christy Wolfe.

Passion, Prejudice and Other Arbitrary Factors
The defendant argues that the trial court's ruling limiting the testimony of defense witness, Dr. Mark Cunnigham, injected an arbitrary factor into the proceedings. However, this issue was dealt with in depth in its individual assignment of error and is without merit. An independent review of the record does not provide any indicia of passion, prejudice or arbitrariness.

Aggravating Circumstances
At trial, the State argued that the defendant was engaged in aggravated burglary and aggravated or forcible rape during the commission of the crime and that the offense was committed in an especially heinous, atrocious or cruel manner. The jury found the existence of both.
The State presented more than sufficient evidence to demonstrate that the instant murder was committed in the course of an aggravated burglary in which the victim was beaten and strangled to death, and sexually assaulted, after the defendant made an unauthorized entry into her residence. La. R.S. 14:60; Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Further, even accepting the defendant's claim treated in assignments of error numbers one, ten and fifteen, supra, that the evidence failed to support that the murders were "committed in an especially heinous, atrocious, or cruel manner," the failure of one aggravating circumstance does not require setting aside a capital sentence resting upon other properly found aggravating circumstances unless the evidence introduced to support the failed circumstance interjected an arbitrary factor into the proceedings. State v. Welcome, 458 So.2d 1235, 1245 (La.1983). In this case, the evidence presented by the State during the guilt stage had already fully informed the jury of the manner in which the offense was committed, which was relevant and properly admitted at trial. See State v. Roy, 95-0638 p. 19 (La.10/4/96), 681 So.2d 1230, 1242 (La.1996). Thus, reintroduction of this evidence at the penalty phase did not interject an arbitrary factor into the proceedings. See La. C.Cr.P. art. 905.2 A ("The jury may consider [at sentencing] any evidence offered at the trial on the issue of guilt.").

Proportionality
Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990). This court, however, has set aside only one capital sentence on the ground that it was disproportionately excessive under the post-1976 statutes, finding in that case a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987), (involving a conviction reversed on other grounds but containing dicta suggesting the death penalty disproportionate; on remand, the state reduced the charge to second degree murder and the jury returned a verdict of manslaughter). This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 7.
*1042 Since January 1, 1976, prosecutors of the 26th Judicial District Court, which is comprised of Bossier and Webster Parishes, have obtained thirteen first degree murder convictions under the present statutory scheme. Of these thirteen cases, five resulted in the imposition of the death penalty, with four being affirmed by this court and one resulting in the annulment of the death penalty and the imposition of a life sentence.
In State v. Jenkins, 340 So.2d 157 (La. 1976), the defendants, Jenkins, Waters and Paschal, fatally shot a teller at Peoples Bank & Trust Company of Minden during an armed robbery. All three were convicted of first degree murder and sentenced to death. The convictions were affirmed, but the death sentences annulled and defendants were sentenced to life imprisonment. In State v. Moore, 414 So.2d 340 (La.1982), the defendant raped and murdered a young mother in her own house. The defendant stabbed the victim fourteen times following the rape perpetrated in the presence of the victim's four month-old daughter. Moore's conviction of first degree murder and sentence of death were affirmed. State v. Knighton, 436 So.2d 1141 (La.1983), involved the murder of a service station attendant during the commission of an armed robbery. The defendant was sentenced to death and his conviction and sentence were affirmed.
In State v. Wingo, 457 So.2d 1159 (La. 1984), Jimmy Wingo and Jimmy Glass forcibly entered the home of Mr. and Mrs. Newt Brown. They bound and gagged the Browns, ransacked the house and stole a large amount of money, a .38 caliber pistol, a .30-.30 lever action rifle, a shotgun and clothing. They then killed the Browns by shooting them "execution style" in the back of the head. The defendants were both convicted of first degree murder and sentenced to death. Their convictions and sentences were affirmed. In State v. Byrne, 483 So.2d 564 (La.1986), the defendant bludgeoned his girlfriend to death during the course of an armed robbery. He was subsequently convicted of first degree murder and sentenced to death. His conviction and sentence were affirmed.
A review of these five other capital verdicts from Bossier Parish does not suggest that defendant received a disproportionately harsh sentence.
Further, a state-wide review of factually similar cases also does not suggest that defendant's sentence was disproportionately harsh. Louisiana juries appear prone to impose capital punishment for crimes committed in the victim's own home. See State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116; State v. Code, 627 So.2d 1373 (La.1993); State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Perry, 502 So.2d 543 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987); State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985); State v. Glass, 455 So.2d 659 (La. 1984), cert. denied, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985); State v. Summit, 454 So.2d 1100 (La.1984), cert. denied, 470 U.S. 1038, 105 S.Ct. 1411, 84 L.Ed.2d 800 (1985); State v. Williams, 490 So.2d 255 (La.1986), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987). As the court in Wingo observed, "[t] he murder of a person by an intruder violating the sanctuary of the victim's own home [is] a particularly terrifying sort of crime to decent, law abiding people." 457 So.2d at 1170. Moreover, juries in Louisiana have frequently imposed the death penalty in similar cases of sexual assault, battery and strangulation. State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651; State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190; State v. Wille, 559 So.2d 1321 (La.1990); State v. Loyd, 489 So.2d 898 (La.1986); State v. Jones, 474 So.2d 919 (La.1985); State v. Brogdon, 457 So.2d 616 (La.1984); State v. Celestine, 443 So.2d 1091 (La. 1983); State v. Flowers, 441 So.2d 707 (La.1983); State v. Collins, 370 So.2d 533 (La.1979). Consequently, defendant's death sentence is not disproportionate.

*1043 DECREE
For the reasons assigned herein, the defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Cr. P. art. 923 of finality on direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
NOTES
[*] Calogero, C.J., not on panel. See Rule IV, Part 2, § 3.
[2] Assignments of error involving settled principles of law are treated in an unpublished appendix, which is attached to this opinion and is part of the official record in the case.
[3] The jury found that the murder was committed (1) while the offender was engaged in the perpetration of Aggravated Burglary and Aggravated or Forcible Rape and (2) in an especially heinous manner.
[4] The defendant also argues that Detective Hamm's testimony at the suppression hearing is contradicted by the information in the police report. The police report, written by Detective Presely, who was deceased at the time of trial, reads that Christina Casey "knew there to still be several boxes still [sic] inside the residence that could not be unpacked due to limited space, but did not recall seeing a roll of clear packaging tape." However, at the motion to suppress hearing, Det. Hamm, who became the lead investigator after Det. Presely's death and who was present at the interview with Christina Casey, testified that, "I believe it was his youngest daughter, Christina, that had told me there was a roll of tape there." However, the warrant, on its face, does not make any reference to a roll of tape being in the defendant's apartment. Thus, this apparent contradiction has no real meaning in the context of probable cause to issue the warrant and is irrelevant. Furthermore, this court's four-corner rule precludes the use of Det. Hamm's hearing testimony, assuming that the testimony and not the police report gave an accurate accounting of the information provided by Christina Casey, to bolster the probable cause showing of the affidavit against an attack on staleness grounds. State v. Barrilleaux, 620 So.2d 1317, 1321 (La.1993) ("The obvious purpose of the `four corners' doctrine is to require an officer seeking a search warrant to reveal, at the time of the issuance of the warrant, all information that he possesses bearing on the probable cause determination to be made by the magistrate, thereby preventing the potential for abuse by the officer's questionable supplementing of that information when the warrant is challenged after the search and seizure.").
[5] Although, from the record, it appears the trial court did accept the report as a proffer, it is not in the record or exhibits currently before this court.
[6] Q: On September 13th, 1989, are you aware of a telephone call made from your number, from the telephone number of uh  at your apartment, to the Sundowner Motel?

A: Yes, sir.
Q: And are you aware that the caller wanted to have photographs made of an eleven year old female in her nighties?
A: That's not true.
Q: Let me read to you something here that's in the report.
A: I know it's in the police report, but that's not what happened.
Q: Let me read you this and then you can tell me if this is incorrect.
A: All right.
Q: Complainant, the clerk at the Sundowner Motel, said a white male caller wanted her to describe the room layouts of the hotel, and this is the person who called, because he had an eleven year old female that he wanted to take pictures of in nighties and that she played along to get a name and phone number.
A: That is absolutely not true.
Q: Are you aware that there was a long telephone conversation between the person who called and the complainant who was the clerk at the Sundowner Motel?
A: It was not a long call, sir.
Q: How do you know?
A: Because I made the call.
Q: You made the call?
A: Yes, sir.
Q: And how did you identify yourself?
A: I don't remember. It's been a long time ago...
Q: ... And in that call, when you made that call, did you and uhifdid you get the complainant to talk about different clothes and poses that you could get you little niece to do uhand called her by the name of Kathy?
A: No, sir.
Q: Okay. And then you're going to take pictures of her while she was in these little clothes ...?
A: ... No, sir, I did not.
Q: called her by the name of Kathy?
A: Absolutely did not.
Q: Did you ask about taking poses in a two piece bikini and then in the nude after talking about everything in-between?
A: I didn't make that conversation, no sir.
Q: Well you said you made the call.
A: I made the call, but I did not start the conversation. I am not the one that did the conversation
Q: So this police report with
A: is inaccurate ...
[7] The defense also argues that someone named Greg Doroughty was involved in the crime. However, the only time this name was mentioned during the trial was when defense counsel asked Cheryl Wolfe if her daughter had ever been sexually abused by a man named Greg Doroughty to which she answered in the affirmative. Clearly, a long ago incident of sexual abuse, with nothing more, does not support the defense's contention that Greg Doroughty was involved in any way with this crime.
[8] Defendant also points to the State's characterization of his expert witness, Nick Molligan, retired supervisor of the New Orleans Police Department's crime lab. Specifically, defendant objects to the prosecutor's description of the New Orleans Police Department as one of "the most corrupt police departments in the world." However, the prosecutor did not make this remark during closing arguments, but during his cross-examination of Molligan. The trial court sustained the defense's objection and instructed the jury to disregard the remark. Thus, the argument has no merit here.
[9] The passage from the prosecutor's closing remarks of which the defendant complains is as follows:

First, let's get past the foreign hairs and foreign fibers stuff. Foreign hairs and foreign fibers are great evidence in cases like Wayne Williams, the man who killed over twenty-four young boys and men in Atlanta, where they traced one piece of fiber that was the only piece of fiber that was on every body they recovered. That was the only thing that was a common denominator out of all twenty-four of those bodies was that piece of fiber and they traced that piece of fiber back to the yellowish green carpet that Wayne Williams had in his house by the number of carpets that were sold of that color made. [sic] It was a carpet that was only made one year by one manufacturer. Only so many yard of it were sold. It was an old carpet and it was estimated it was probably only [sic] about ten houses in the entire Atlanta area that may have had that carpet left. That made good evidence. It's good in cases like Ted Bundy who goes all the way from Oregon to Florida contacting people that he had no other reason to be in contact with, none of his friends knew them, none of their friends knew him, and they started finding hair and fiber that were foreign to their environments and traced directly back to him, his hair. That's good. But we don't have twenty-four dead people....We have a twelve year old little girl, one case of murder. So foreign hairs and foreign fibers are not good evidence in this type of case.
[10] The passage from the prosecutor's closing remarks of which the defendant complains is as follows:

I'm going to tell you something else though, that fingerprint is better evidence than a twelve year old girl name of Christy Wolfe coming back from the grave and coming right up here and telling you face to face that's the man that did it to me. You know why? It was dark. She was beaten. That tape was wrapped around her head and probably covering her eyes....Now you tell me how easy it is for you in that type of situation to identify somebody. That would have been dang hard. You would have had the possibility of a misidentification of somebody.... But a fingerprint doesn't misidentify. Never. Mr. Getz says every fingerprint in the world is different....
[11] Specifically, the defendant complains of the following ruling by the trial court:

It's been indicated that Dr. Cunningham's going to be tendered as an expert and I, first of all, refer to Article 705 ... that states in a criminal case every expert witness must state the facts upon which his opinion is based provided, however, that with respect to evidence which would otherwise be inadmissible such basis shall only be listed on cross examination. So based on that the expert will obviously have to give the facts upon which his opinion is based and then our general hearsay rule prohibits any out ... of court statement being used to prove a fact. But there's certain exceptions to that and one of the exceptions is found in Article 803, part 4, that states that any statement for purposes of medical treatment or medical diagnosis is an exception to the hearsay rule. Any diagnosis in connection with treatment and any medical history described therewith is an exception. So by analysis what I'm saying is that this expert can base his opinion on facts related to him by Mr. Casey and by Mr. Casey only, and that would be my ruling. Therefore, he cannot get up here and relate facts that were given to him by other people and treat those facts as having been proven and then state an opinion on those.
Immediately following the court's ruling, the defense lodged an objection.
[12] During the hearing on defendant's Motion for New Sentence Hearing, defense counsel was instructed by his client not to proffer documentation and an affidavit from Dr. Cunningham. These documents allegedly dealt with some of the testimony excluded by the trial court, presumably the sexual abuse evidence. Thus, there is no evidence in the record about any sexual abuse at all, whether that suffered by the defendant or witnessed by the defendant.