DREW, J.
 

 | jLeroy Davis was convicted at jury trial of the second degree murder of his wife. He received the mandatory sentence of life imprisonment at hard labor without benefits. He appeals. We affirm in all respects.
 

 FACTS
 

 In January of 2007, the defendant told police that his wife, Annette Davis, had been missing for two days. Annette’s vehicle was soon discovered after a plea for help was aired on the local news. Two months after her disappearance, her body was found in a shallow grave off Newell Ridge Road, northwest of Newellton. She died from blunt force trauma to her head.
 

 TESTIMONY AND EVIDENCE
 

 1. Officer Clarence Hall of the New-ellton Police Department testified that:
 

 
 *1114
 
 • on Tuesday, January 16, 2007, around 7:30 p.m., Leroy Davis flagged him down and told him that he needed to speak with the police chief;
 

 • since the police chief was unavailable, Officer Hall had Davis come to the police station to speak with him;
 

 • Davis mentioned something about needing another cell phone;
 

 • after a brief conversation, the officer left to answer an alarm call;
 

 • after completing that call, he was again flagged down by Davis, at which time they returned to the station and talked some more;
 

 • Davis told the officer that his wife had been missing for a couple of days;
 

 • the officer called Annette’s cell phone, but no one answered;
 

 • he then called Annette’s place of employment and was told that she was not there;
 

 12* he kept trying to call Annette’s cell phone until after midnight, at which time he called the sheriffs office to advise that the lady was missing;
 

 • Detective John Matthews came to the Newellton Police Department to speak with Davis; and
 

 • he (Hall) spoke with Annette’s son, who told him that Davis had been recording Annette’s telephone conversations and that his mother had asked him to pass this information on to the sheriffs office.
 

 2. Detective John Matthews of the Tensas Parish Sheriffs Office testified that:
 

 • he first spoke with Davis early Wednesday morning, January 17, 2007, at the Newellton Police Department;
 

 • Davis told him that he hadn’t seen his wife since Sunday, January 14, when he left to take his daughter to college;
 

 • Davis gave him a written statement detailing what he did on that Monday;
 
 [1]
 

 • Davis then gave a statement detailing what he did on that Tuesday;
 
 [2]
 

 • at this point, Davis conveyed to Detective Matthews his fear that someone had kidnapped his wife on her way to work;
 

 
 *1115
 
 |3* he (Matthews) reported his findings to Sheriff Ricky Jones early the next morning, whereupon the two made several phone calls to the hospital where Annette worked and also contacted the news media with a request for the public’s assistance in finding Annette or her car;
 

 • the television station’s story led to the discovery of the vehicle in Madison Parish;
 

 • he interviewed Davis’s sister, Jackie Sardinas, who said that he had contacted her Monday, asking to be picked up from a truck stop in Tallu-lah;
 

 • the next morning, she admitted lying the day before about picking up her brother from a truck stop, admitted that he had actually called her a few days earlier and had her drive out to Highway 603, telling her that if his truck ever broke down, he would need her to pick him up right there;
 
 [3]
 

 • she then told Matthews that she actually picked up Davis about a quarter of a mile north of that area on that Monday;
 

 • Ms. Sardinas took him to the exact location where she had picked him up;
 

 • using photographs, Matthews showed the jury the area in question, pointing out the close proximity to where Annette’s vehicle was found;
 

 • Matthews never asked Davis if his car had broken down in that area; and
 

 • He had never heard about a farmer jumpstarting the defendant’s truck.
 

 3. Tensas Parish Sheriff Ricky Jones testified that:
 

 • he became involved in the case after a Newellton police officer contacted him;
 

 • as soon as he read defendant’s first statement he knew that Davis was guilty;
 

 • the tipoff was the attempt to set up such an elaborate alibi;
 

 14* he contacted a local news station and gave them a picture of Annette and a detailed description of her car, in an appeal to the public for help;
 

 • because of the media’s help, the car was located in Madison Parish;
 

 • he went to the scene, finding a pair of white Crocs shoes in the car;
 

 • the car, registered in Annette’s name, had a flat tire;
 

 • Louisiana State Police became involved, with Trooper Harwell as lead investigator;
 

 • Davis told officers that they would receive a “sign of his innocence”;
 

 • a letter addressed to Jones was received a short while later by Harwell;
 

 • the letter said Annette was okay because, “God takes care of his own”;
 

 • the mailing contained a cell phone;
 

 • Davis gave verbal consent for the police to search his home;
 

 • Harwell found a drop of blood on a shoe in the hallway;
 

 • a search warrant was secured, the execution of which revealed blood splatters on the walls and carpeting in the hallway, on picture frames, on a bookshelf, with most of the blood found on the carpeting;
 

 • Davis admitted recently purchasing carpet runners in the hallway;
 

 • State Police Crime Lab personnel cut a piece of the carpeting for testing, which showed that the blood had
 
 *1116
 
 soaked through the carpeting and padding, leaving a stain on the concrete foundation of the floor;
 

 • Davis said that he did not know what was splattered on the wall;
 

 • Davis was interviewed several more times;
 

 • the police received another letter, triggering another search of the Davis home for the typewriter or printer that generated the correspondence;
 

 • no physical evidence was found to link Davis to the letters, and the only print discovered was that of Sheriff Jones;
 

 [
 
 -•
 
 when asked by Davis whether they had received any signs, the officers responded in the negative;
 

 • within a few weeks, three anonymous letters were received by the officers;
 

 • the third letter in regard to Annette (referred to therein by her first name, Melanie) stated that she was doing well, was sorry for what she had done, but that she wanted to start a new life, requesting that her family stop wondering about her whereabouts, as she did not want to be found;
 

 • a Crime Stoppers caller from Ouachita Parish claimed to have discovered a grave at the intersection of Highways 888 and 575;
 

 • he (Jones), Matthews, and Chief Deputy Rushing went to the site, noting that the corners of the grave were marked by bricks, and a pipe with artificial flowers was stuck into the ground;
 

 • the pipe and flowers were located above the body’s head, leading him (Jones) to reason that whoever left them knew how the body was arranged;
 

 • he contacted the State Police Crime Lab, who in turn contacted Mary Man-hein, a nationally known expert in forensic anthropology;
 

 • in court, he identified the gravesite on a map, locating it just west of Newell-ton, off Highway 888, down a turn row, next to a cemetery;
 

 • he stayed while the female body, wrapped in plastic and tied with rope, was excavated from the grave;
 

 • the body was in a River Region shirt, with a necklace inscribed with an “A”;
 

 • the body had a black garbage bag on her head;
 

 • the autopsy reported the cause of death to be blunt force trauma to the head;
 

 • Ms. Manhein identified the body as Melanie Annette Davis;
 

 • Davis was arrested the day after the body was found and identified;
 

 • an inmate, Craytonia Badger, later wrote him (Jones) about a conversation he had with Davis in jail, during which Davis admitted ^attempting to murder his wife on three separate occasions, the first two being unsuccessful;
 
 [4]
 

 • Badger’s credibility was enhanced by his coming forward with information not known to the general public — that the defendant had AIDS;
 

 • Davis told Badger of his wife’s unfaithfulness;
 

 
 *1117
 
 • he (Davis) also told Badger that digging the grave took several days;
 

 • Juanita “Pete” Mizell thought she saw Davis driving his wife’s car on the Monday in question, January 15, 2007, on a bridge on Highway 888, near where Annette’s body was later discovered;
 

 • he (Jones) admitted that no other suspects were developed;
 

 • there was neither DNA nor any fingerprints linking Davis with the letters;
 

 • the only circumstantial evidence linking the letters to Davis was that Davis had told police they would receive a sign that he was innocent;
 

 • he had never arrested the defendant before, and he was unaware of any domestic problems between Davis and Annette;
 

 • Davis cooperated with police by giving voluntary statements, and by giving verbal consent for the search of his home;
 

 • no weapon was ever recovered at the defendant’s home, and no physical evidence linked Davis to the crime, other than her blood being at his home;
 
 [5]
 

 • the last person to know that Annette was alive was her son, who spoke to her on the phone in the late afternoon on the Monday in question;
 

 [ 7» Ms. Sardinas and Davis both placed him at home on Monday at 6:30 p.m.;
 

 • he was at a lodge meeting sometime around 7:00 or 7:30 p.m.;
 

 • Davis went to a bar afterwards;
 

 • on Tuesday, Davis went to work, then drove around north Louisiana, visiting a loan company, a bank, a gasoline station, and a man about Jeep repairs;
 

 • no physical evidence tied Davis to the gravesite;
 
 [6]
 

 • concerning Badger’s information, he (Jones) never confirmed with prison officials that Badger and Davis had any contact, nor did he confirm whether or not Davis had perpetrated domestic violence on Annette in the past;
 

 • Badger received no benefit for supplying the information on Davis;
 

 • no neighbors saw the defendant load anything into a car;
 

 • he did not know whether police had checked phone records to see if Davis had tried to call his wife during this time frame;
 

 • a person was indeed arrested for the theft of Davis’s cell phone;
 

 • it was very possible that Davis did not leave fingerprints because he was wearing gloves, and his DNA would have been all over the crime scene anyway, as it was his own home;
 

 • since the gravesite was outdoors, any DNA could have washed away;
 

 • no evidence was ever found that any other suspect was ever in the home of the defendant and Annette, during this time frame;
 

 • if there had been domestic abuse between Davis and Annette, it was quite possible that no one else knew, not even family members;
 

 • Annette was having an affair with a man named Richard Dunmore, who had solid alibis for his whereabouts during the critical couple of days; and
 

 
 *1118
 
 • the conversations with Davis about “signs of innocence” was during the same relatively short time frame during which the letters came.
 

 |s4. Investigator Rob Rushing of the Tensas Parish Sheriffs Office testified that he was present when the defendant made a statement on January 17, 2007, though Officer Harwell was the officer who actually took the statement. Rushing authenticated the videotape of this statement, which was taken on Wednesday, the day after Annette was reported missing. The tape was then played in open court.
 

 Officer Rushing testified that at the time the statement was recorded, the case concerned a missing person. He stated that the Louisiana State Police were not called in until Annette’s abandoned car was found; however, his office continued to assist in the investigation.
 

 He testified that he found some of the information Davis told him to be true, and some false. The defendant admitted to having extramarital affairs and told police that his wife did as well. It appeared from the information given to police by Davis that Annette had infected him with HIV, but during their investigation, police discovered that Davis got sick first. Davis told him he went to a lodge meeting on Monday in his 1998 Oldsmobile, which was later confirmed. Davis also said in his statement that he never argued with his wife, which fact was discredited during the police investigation that revealed that the two argued quite often.
 

 Police also discovered that Davis did not travel through Delhi and go to a truck stop in Tallulah, although he had said this in his statement. Davis also said during his statement that when his sister dropped him off that evening at home, neither Annette nor her vehicle was there; however, witnesses (Richard Dunmore, Demarco Dunmore, and Jackie Sardinas) [¡¡stated that Annette’s vehicle was there that evening. Jackie Sardinas stated that her car was there when she dropped her brother off. Richard Dunmore said he saw Ms. Sardinas drop Davis off and noticed that Annette’s car was at home.
 

 5. Deputy Jack McMillan of the Ten-sas Parish Sheriffs Office interviewed Emma Bass as part of his investigation. He stated that Ms. Bass was a friend and coworker of Annette’s. Ms. Bass told Deputy McMillan that she had received a phone call from the defendant wherein he told her his whereabouts on Tuesday. Ms. Bass thought it was strange that he called because they weren’t close. In fact, at one time, he had accused her of knowing that Annette was having an affair.
 

 Deputy McMillan also interviewed a person by the name of Craig Jones on January 19, 2007. Jones told McMillan that he had seen Davis’s truck parked on Highway 575 on Tuesday morning around 11:00 a.m., and that a shovel was in the bed of the truck. By evening, the vehicle was gone. Deputy McMillan, who is familiar with the area, stated that the area where Jones told him he saw Davis’s truck was approximately 200 yards from where Annette’s body was found.
 

 Deputy McMillan also interviewed Juanita Mizell. She told him that she lived on Newell Ridge Road (Highway 888). She stated that on Monday, January 15, 2007, sometime around dusk, while she was making a turn onto Highway 575 from Highway 888, she noticed a vehicle parked on Highway 888, parked on a bridge. The vehicle didn’t have its lights on and the trunk was open. A person dressed in camouflage was standing on the | inrail of the bridge. The person turned and waved at her and she recognized the person to be the defendant. She stated that she knew Davis because she went to school with him.
 
 *1119
 
 She estimated that she saw Davis around 6:00 or 7:00 p.m. Mizell said the car was a silver car, and that it was the same model of car that a Chelsea Carden (an acquaintance of Mizell’s) drove. Deputy McMillan located Carden’s vehicle and confirmed that it was the same make and model as Annette’s vehicle. Deputy McMillan testified that the bridge is approximately one to two football fields from the gravesite where the police found Annette’s body.
 

 On cross-examination, Deputy McMillan admitted in the notes he took during Mi-zell’s interview on February 1, 2007, he had not written that Mizell identified the man on the bridge as Davis. This fact was present only in his March 22, 2007, report.
 

 After the jury found Davis guilty of second degree murder, the trial court denied his motion for judgment of acquittal and for new trial. The defendant was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence, to run concurrently with any other sentence.
 

 DISCUSSION
 

 Sufficiency
 

 Our law on sufficiency of the evidence is well settled.
 
 [7]
 

 
 *1120
 
 |nThe circumstantial evidence is overwhelming, and the verdict is amply supported by this record. Consider:
 

 • how unlikely it would be for a person to live in a home for days and not notice the sight and smell of a blood-soaked hallway; • how the timing of Davis’s purchase of the runner for the hall appears especially devious;
 

 |1¾* how defendant’s predictions of exonerating “signs,” closely followed by three self-serving letters, are about as phony as it gets;
 

 • how his frenetic efforts at establishing successive contradictory alibis worked against him;
 
 [8]
 

 • how bragging to another inmate could produce nuggets of information known only to the killer;
 

 • how Davis’s actions early on were anything but those of a concerned husband of a missing wife;
 

 • how his story that Annette’s car was gone Monday night was denied by his own sister and Richard Dunmore;
 

 • how unexplainable it looks for the DNA of Davis and his wife to be mixed together at two places in Annette’s car;
 

 • how Juanita “Pete” Mizell identified the defendant with Annette’s car, as he was dumping something off the bridge located between the gravesite and his home (denied by defendant); and
 

 • how Annette’s car was found only 200 yards from where he had left his truck.
 

 Pro Se Assignments
 

 Davis lists seven assignments, the first six being primarily in the nature of argument, or stream of consciousness. There’s really nothing to discuss.
 

 The first six assignments:
 

 1. Defendant was prejudiced that the ADA’s opening statement alleged this was a crime of passion, ignited by defendant’s wife having an affair;
 
 [9]
 

 |132. A misstatement concerning “Pete” Mizell’s identification of him on the bridge
 
 [10]
 
 and the Crime Stoppers call
 
 [11]
 
 being undisclosed
 
 Brady
 
 material;
 
 [12]
 

 
 *1121
 
 3. Alleged conflicts in the testimony of the state crime lab personnel and Sheriff Jones, about whether or not his fingerprints were on the envelope of the mysterious letters received by him;
 

 4. None of the “sign” letters could be traced to his home;
 

 5. The state tried to prove he was on a bridge on the Monday in question;
 

 6. The state disclosed a handwritten note to Sheriff Ricky Jones.
 

 Impliedly, defendant’s assignment of error number seven hints at a true issue,
 
 ie.,
 
 a permutation of an allegation of ineffectiveness of counsel, in that his lawyer didn’t call as witnesses the 28 names that the defendant had given to a paralegal. Defendant’s
 
 pro se
 
 filing does not favor this court with an explanation as to how any of these witnesses would or could have helped his case. More than half of these witnesses were law enforcement officers or associated with the prosecution’s case, and many of the 23 witnesses actually testified.
 

 A fair reading of the transcript clearly reveals that the defense lawyer aggressively and effectively represented the defendant. We decline to second-guess defense counsel’s trial strategy.
 

 CONCLUSION
 

 The evidence here is circumstantial, yet overwhelming. It is hard to | ^conceptualize a circumstantial case any stronger than this. It was proven beyond a reasonable doubt that this defendant killed his wife, Melanie Annette Davis.
 

 DECREE
 

 The defendant’s conviction and sentence are AFFIRMED.
 

 [1]
 

 . Davis wrote that on Monday, he woke up around 6:30 a.m., went to work, left work around 3:00 or 3:30 p.m., went to Wal-Mart for about 30 minutes and then came home around 6:00 or 6:30 p.m., with his wife not being present at the house. Later he went to a lodge meeting, stopped at a bar afterwards, and returned home again around 10:00 p.m. During this statement, Davis never mentioned that his truck broke down or that his sister picked him up to bring him home. Detective Matthews testified that Davis also never mentioned that he drove his wife’s vehicle, or was near Newell Ridge Road, on that date.
 

 [2]
 

 . Davis wrote that on Tuesday, January 16, he got up and arrived at work at around 8:00 a.m. He stayed for a short period of time and then left somewhere between 9:00 or 9:30 a.m. to go to die Tower Loan in St. Joseph to complete a loan application. He then went to Tensas State Bank in Newellton to make a deposit. He got gas and activated a cell phone in Shreveport. He then left Shreveport and called Verizon in reference to his early report that his cell phone was missing. He then drove to Monroe, where he had a daughter (or two' daughters) who went to college, gave them each $20.00, and drove home. He revealed nothing at this point about his truck breaking down at the intersection of Highway 888 and 575. Davis told Matthews that he had contacted the hospital where his wife worked on Tuesday evening to see if she had come in for her shift. He also told Matthews that he called his wife's friend, Emma Bass, who told him that she had seen Annette driving her car on Monday night on her way to work. Ms. Bass later denied telling Davis that she saw Annette on that Monday evening.
 

 [3]
 

 . This location turned out to be about two-tenths of a mile south of where Annette’s vehicle was later discovered.
 

 [4]
 

 . Davis told Craytonia Badger that he had picked up two barrels and some cement and intended to incapacitate his wife, put her in the barrels with cement, and throw her into the Mississippi River. He said the plan failed because as he was trying to beat his wife unconscious, his daughter walked in. The second attempt involved rat poison in her food, but she didn't eat supper that evening. He finally killed her by hitting her with something. He buried her in a shallow grave.
 

 [5]
 

 . Later testimony of crime lab personnel showed additionally that DNA of both defendant and victim were mixed in two locations in her car: the steering wheel cover and a portion of the left rear carpet in the trunk.
 

 [6]
 

 . No fingerprints, no shoe prints, and no DNA evidence.
 

 [7]
 

 . When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under
 
 Hudson v. Louisiana,
 
 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt.
 
 State v. Hearold,
 
 603 So.2d 731 (La.1992);
 
 State v. Bosley,
 
 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347,
 
 writ denied,
 
 97-1203 (La.10/17/97), 701 So.2d 1333.
 

 The
 
 Jackson
 
 standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Dotie,
 
 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Eason,
 
 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685;
 
 State v. Hill,
 
 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758,
 
 writ denied,
 
 2007-1209 (La.12/14/07), 970 So.2d 529.
 

 The
 
 Jackson
 
 standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983);
 
 State v. Speed,
 
 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582;
 
 State v. Parker,
 
 42,311 (La.App.2d Cir.8/15/07), 963 So.2d 497.
 

 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion.
 
 State v. Gullette,
 
 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753;
 
 State v. Burd,
 
 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219,
 
 writ denied,
 
 2006-1083 (La.11/9/06), 941 So.2d 35.
 

 The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law.
 
 State v. Casey,
 
 99-0023 (La.1/26/00), 775 So.2d 1022,
 
 cert. denied,
 
 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
 

 
 *1120
 
 Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency.
 
 State v. Speed,
 
 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582,
 
 writ denied,
 
 2009-0372 (La.11/6/09), 21 So.3d 299;
 
 State v. Allen,
 
 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622,
 
 writs denied,
 
 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255,
 
 cert. denied,
 
 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
 

 The
 
 Jackson
 
 standard neither permits a reviewing court to second-guess the rational credibility determinations of the fact finder at trial,
 
 State ex rel. Graffagnino v. King,
 
 436 So.2d 559 (La.1983), nor requires a reviewing court to consider the rationality of the thought processes employed by a particular fact finder in reaching a verdict.
 
 State v. Marshall,
 
 2004-3139 (La.11/29/06), 943 So.2d 362,
 
 cert. denied, 552
 
 U.S. 905, 128 S.Ct. 239, 169 L.Ed.2d 179 (2007).
 

 [8]
 

 . Particularly the bogus version of where his sister took him, and the refuted information about Emma Bass telling him that she passed Annette on the way to work that Sunday.
 

 [9]
 

 . Because of his wife’s alleged infidelity.
 

 [10]
 

 . She testified clearly about the encounter.
 

 [11]
 

 . The farmer who called Crime Stoppers discovered the grave.
 

 [12]
 

 .
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a landmark case requiring prosecutors to provide exculpatory evidence to the accused.