PITMAN, J.
| ,Defendant Patrick R. Davis was found guilty of issuing worthless checks to Horseshoe Casino (“the Horseshoe”) in the amounts of $100,000 and $150,000 in violation of La. R.S. 14:71. He was sentenced to six years at hard labor with all but one year suspended. Upon his release, Defendant was ordered to serve five years of supervised probation, to pay restitution to the Horseshoe in the amount of $215,000 and to pay a fine of $1,000, in addition to other standard conditions of probation. For the reasons stated herein, we reverse Defendant’s conviction and sentence and order that he be discharged.

FACTS

Defendant is a chiropractor from Dun-canville, Texas, a suburb of Dallas. He is a high-stakes gambler at the casinos in Shreveport/Bossier City, and prefers the Horseshoe. In June 2008, Defendant was gambling at the Horseshoe and signed markers for $100,000 and $150,000 and lost all of the money at the tables. After months of negotiations and Defendant’s failure to pay on the debt, the markers were submitted for payment to Defendant’s financial institutions, but were returned unpaid. Thereafter, the matter was turned over to the Bossier Parish District Attorney’s Office, and a bill of information was filed charging Defendant with issuing worthless checks, a violation of La. R.S. 14:71.
Prior to trial, counsel for Defendant made an oral motion in limine to have the photocopies of printed counter-checks, which were issued by the casino as evidence of the debts, excluded from evidence because the district attorney had failed to present certified copies or properly authenticate the Rcopies as required by La. R.S. 14:71. The trial court agreed and granted the motion as to the actual copies of the counter-checks. In so ruling, however, the trial court expressly stated that the “checks” could be referred to as counter-checks, markers or instruments, and that it would allow testimony from the business records of the Horseshoe regarding the extension of credit to Defendant in the form of markers and the fact that the markers had not been satisfied. Any reference to a “check” or that any instrument was returned marked “insufficient funds” was prohibited.
A jury trial was held and the following facts are gleaned from the testimony:
Karen Haydale, the current credit manager of the Horseshoe, testified regarding the procedure followed by all patrons seeking credit with the casino and defined all the terms necessary for understanding how a casino credit system works. Ms. Haydale testified that, after application for credit and credit approval, patrons can *1260 obtain chips up to a certain predetermined limit, for which they sign a “marker” or “counter-check” for the amount of chips given them indicating that indebtedness. Counter-checks are synonymous with markers. They can be paid or redeemed at the casino in a variety of ways, i.e., through payment with chips, cash, personal checks, certified checks or by the counter-check being presented for payment at the banking facility listed on the patron’s credit application. The Horseshoe typically allows 30 days for repayment of the marker by a patron. If the marker is not satisfied by the patron and no other payment extensions or arrangements are made, it is deposited with the banking institution provided |sby the patron during the application process.
Ms. Haydale also testified regarding Defendant’s account with the Horseshoe, which was represented by a 24-page printout of transaction history. As with all patrons to whom credit is extended by the Horseshoe, Defendant had to make an application and supply personal information, such as driver’s license and bank account information, to the casino’s credit department. He was also required to provide checks on his bank accounts at Bank One and Comerica, with their routing numbers, to be linked to the casino credit account. He signed an agreement expressly authorizing the casino to present drafts for payment with those banking institutions in order to satisfy unpaid markers to the casino.
After the credit check was performed and inquiry was made into the levels of funds available in the bank accounts supplied by Defendant, an authorized employee of the Horseshoe credit department approved him for a credit line of $75,000. In April 2006, his credit limit was increased to $150,000 and, in March 2007, it was increased to $250,000 at Defendant’s request. At some point during this time period, Defendant provided the Horseshoe with the information on an account he held with E-Trade and linked his line of credit to that account.
Ms. Haydale was questioned about the amount of money in Defendant’s bank account in 2006 when his credit limit was increased. She explained that, when accounts were increased, usually bank ratings were often “re-run,” but that she could not determine from the document about which she was testifying whether Defendant’s accounts had been “re-run.” Ms. Haydale further explained that a patron’s request for an increase | generally resulted in the casino performing a “rerun” of the patron’s account, especially if the bank balances the casino had at the time did not reflect a balance that would substantiate the amount the patron was requesting, but it was not always required. Ms. Haydale testified that the casino updated the records of the banks every six months.
When asked about Defendant’s increase to $250,000 in March 2007 and the amount Defendant had in the bank on that date, Ms. Haydale stated that she would not be able to answer without access to the Casino Management System. She stated that the decision to increase a patron’s credit limit was based on bank information, play history, outstanding balances and outstanding balances at other casinos.
Brenda Bison, who was the credit manager at the Horseshoe at the time of Defendant’s indebtedness, testified that, on June 13, 2008, Defendant arrived at the Horseshoe with a cashier’s check in the amount of $85,000. After losing that amount, Defendant signed two markers, or counter-checks, in the amounts of $100,000 and $150,000, and subsequently lost the entire $250,000. At Defendant’s request, the Horseshoe extended the repayment period on those markers from the typical *1261 30 days to 45 days and applied a discount to the amount owed, leaving a balance owed of $215,000.
Within the 45-day grace period, Defendant was in contact with employees of the credit department at the Horseshoe and advised them that he was attempting to liquidate assets in order to satisfy the markers. Ms. Bison testified that Defendant explained he was having trouble liquidating assets because of the national financial crisis. She also testified [ .-that, to her knowledge, Defendant was trying to repay the Horseshoe and was in continuous contact regarding satisfaction of the markers. The business records of the Horseshoe were introduced into evidence, which indicated that several requests by Defendant to extend the deposit dates of the markers were granted in order to allow him more time to obtain the funds necessary to satisfy the debt. Defendant offered to convey a piece of commercial property to the casino in an effort to satisfy the markers, but the Horseshoe declined.
On January 6, 2009, the Horseshoe deposited both markers to Defendant’s E-Trade account, but neither was paid. It was at that time that the matter was turned over to the Bossier Parish District Attorney for prosecution. Frank “Buddy” Mondello, an investigator with the Bossier Parish District Attorney’s Office, testified for the state. He stated that, after the counter-checks were submitted to the district attorney’s office, he issued a demand letter to Defendant.[1] As per a decision made by the Horseshoe, Mr. Mondello advised Defendant that he would have 90 days to pay off the markers or an arrest warrant would issue.
Mr. Mondello testified as to the substance of a response letter he received from Defendant. In the correspondence, Defendant acknowledged receipt of the demand letter and stated that he did not contest the debt to the Horseshoe; however, he denied any fraudulent intent in obtaining the markers in question. Defendant further informed Mr. Mondello that he was | (¡attempting to liquidate assets in order to satisfy the markers.
Mr. Mondello further testified that the district attorney’s office received a $5,000 payment from Defendant, from which the district attorney deducted $500 in fees and transferred the balance of $4,500 to the Horseshoe. Mr. Mondello also testified as to the policies and procedures of the district attorney’s office regarding fees charged on worthless check collections.
The defense did not present any witnesses. The jury found Defendant guilty as charged, and he was sentenced by the trial court to six years, with all but one suspended, followed by five years of supervised probation. The trial court ordered restitution and imposed a $1,000 fine, along with other special conditions. Defendant filed a motion for new trial and a motion for post-verdict judgment of acquittal. Both were denied, and this appeal ensued.

DISCUSSION

Defendant has raised three assignments of error on appeal: (1) the sufficiency of the evidence; (2) that the trial court erred in allowing the district attorney and witnesses to reference “checks,” “counter-checks” and “markers” during the testimony; and (3) that his sentence is excessive.

*1262
Sufficiency of the Evidence

Defendant argues that the state failed to meet its burden of proof with regard to each element of the offense set forth in La. R.S. 14:71.
When issues are raised on appeal, both as to the sufficiency of the 17evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proven beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
Under the Jackson v. Virginia standard, we review the record in the light most favorable to the prosecution to determine whether the evidence was sufficient to convince any rational trier of fact that all the essential elements of the crime had been proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of |sevidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of. the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104,148 L.Ed.2d 62 (2000).
In the case sub judice, in order for Defendant’s conviction to be upheld, the record must establish that the state proved beyond a reasonable doubt all of the essential elements of issuance of worthless checks. La. R.S. 14:71, issuing worthless checks, provides in pertinent part:
A. (l)(a) Issuing worthless checks is the issuing, in exchange for anything of value, whether the exchange is contemporaneous or not, with intent to defraud, of any check, draft, or order for the payment of money upon any bank or other depository, knowing at the time of the issuing that the offender has not sufficient credit with the bank, or other depository for the payment of such check, draft, or order in full upon its presentation.
[[Image here]]
*1263 |fl(b) This Section shall apply to a check, draft, or order tendered for satisfaction, in whole or in part, of payments due on installment contracts, open accounts, or any other obligation for which the creditor has authorized periodic payments or the extension of time in which to pay.
⅜ ⅜ ⅜
(2) The offender’s failure to pay a check, draft, or order, issued for value, within ten days after notice of its nonpayment upon presentation has been deposited by certified mail in the United States mail system addressed to the issuer thereof either at the address shown on the instrument or the last known address for such person shown on the records of the bank upon which such instrument is drawn or within ten days after delivery or personal tender of the written notice to said issuer by the payee or his agent, shall be presumptive evidence of his intent to defraud.
[[Image here]]
C. Whoever commits the crime of issuing worthless checks, when the amount of the check or checks is one thousand five hundred dollars or more, shall be imprisoned, with or without hard labor, for not more than ten years, or may be fined not more than three thousand dollars, or both.
[[Image here]]
G. In addition to any other fine or penalty imposed under this Section, the court shall order as part of the sentence restitution in the amount of the check or checks, plus a fifteen dollar per check service charge payable to the person or entity that initially honored the worthless check or checks, an authorized collection agency, or justice of the peace. In the event the fifteen dollar per check service charge is paid to a person or entity other than one who initially honored the worthless check or checks, the court shall also order as part of the sentence restitution equal to the amount that the bank or other depository charged the person or entity who initially honored the worthless check, plus the actual cost of notifying the offender of nonpayment as required in Paragraph A(2).
Thus, under La. R.S. 14:71, to obtain a conviction for issuing of a worthless check, the state is required to prove beyond a reasonable doubt that: (1) defendant issued, in exchange for anything of value, whether the |inexchange is contemporaneous or not; (2) a check, draft or order for the payment of money upon any bank or other depository; (3) knowing at the time of the issuing that the account on which drawn has insufficient funds with the financial institution on which the check is drawn to have the instrument paid in full on presentation; and (4) the instrument was issued with intent to defraud. Subparagraph A(2) creates a statutory re-buttable and permissible presumption of the issuer’s intent to defraud when the offender fails to pay the amount of the worthless check within ten days of the receipt of notification by certified mail of nonpayment of the check, sent to the address shown on the check or the address shown in the records of the bank on which the check was drawn. State v. Mosby, 42,519 (La.App.2d Cir.5/18/07), 956 So.2d 843; State v. Washington, 29,784 (La.App.2d Cir.9/26/97), 700 So.2d 1068. The presumption, however, is not absolute. State v. Bond, 584 So.2d 1212 (La.App. 2d Cir.1991), citing State v. Lindsey, 491 So.2d 371 (La.1986). The presumption does not relieve the state of its burden of proving beyond a reasonable doubt, the “intent” element, which is subject to the presumption, and the “knowledge” element, which is not subject to the presumption. La. R.S. 15:271.
*1264 The proper inquiry under La. R.S. 14:71(A) is whether a defendant knew that he had not sufficient credit with the bank, not whether his actual monetary balance was sufficient to cover a check, draft or order for payment issued by him. State v. Bond, supra.
In this case, the two elements that are most clearly lacking in proof are Defendant’s alleged intent to defraud the casino at the time he signed for the |nmarkers and his alleged knowledge that he had not sufficient credit with’ E-Trade to cover the markers.
Regarding the element of intent to defraud, the state offered Mr. Mondello’s testimony concerning the demand letter; however, the letter was not admitted into evidence. Arguably, therefore, the evidence that Defendant was notified by certified letter of the debt is lacking; and, thus, the permissive presumption of intent to defraud may not have been triggered. However, even if the state is favored with the presumption, it failed to satisfy its burden of proving intent generally. State v. Bond, supra. Defendant’s response letter to Mr. Mondello indicated he did not dispute that he owed the debt. In that correspondence with Mr. Mondello, Defendant continued to convey his desire to satisfy the debt and expressly denied any intent to defraud or to evade payment.
Further, as evidenced by the testimony of the state’s witnesses from the Horseshoe, Ms. Haydale and Ms. Bison, Defendant remained in contact with the credit department of the casino, was actively attempting to satisfy the markers by liquidating assets, made a partial payment of $4,500 on the debt and indicated on more than one occasion to employees of the credit department that he was attempting to obtain the necessary funds to satisfy the markers. In addition, Ms. Bison testified that it was her belief that Defendant desired to repay the casino and was attempting to do so. Moreover, there is no evidence in the record to suggest that Defendant had ever failed to repay any markers in the past. Rather, he had enjoyed a positive history of gaming, including the extension of markers by the casino and his regular repayment over many years prior to the onset of his financial 112troubles.
Based on the foregoing, the state failed to prove that Defendant had the intent to defraud the Horseshoe at the time he signed for the markers at issue. The jury’s conclusion to the contrary is not reasonably supported by the evidence.
Next, the state failed to prove beyond a reasonable doubt that Defendant knew he had not sufficient credit with his banking institution (E-Trade) to cover the markers at the time he signed for them on June 13, 2008. The state did not introduce the balances of the bank accounts it had on file for Defendant (including E-Trade) on the date the markers were issued to him, or any evidence of what credit limit E-Trade may have extended to him. Ms. Haydale explained that the casino rated the accounts according to the range of funds in the accounts at the time the credit application was made by the patron. While these figures/balances were updated from time to time, there was no specific information introduced by the state regarding Defendant’s E-Trade account on June 13, 2008, the date on which the markers were signed. Furthermore, there was no evidence introduced as to Defendant’s knowledge, or lack thereof, of what was in those accounts on that date or what amount E-Trade would extend to him in payment of any deposits made against the account. In addition, at Defendant’s request, deposit of the markers to his E-Trade account was delayed more than six months. There simply is no evidence that there were insufficient funds in the E- *1265 Trade account on June 13, 2008, or that Defendant had any knowledge of that fact. The record does not contain a reasonable basis upon which to base a contrary conclusion.
| i3In summary, in order to convict, the circumstantial evidence must exclude every reasonable hypothesis of innocence. A rational trier of fact could not draw the conclusion from the circumstances of this record that Defendant had both the intent to defraud the casino and the knowledge that he did not have sufficient credit with the bank for payment of the markers when he signed for them. Jackson v. Virginia, supra. Accordingly, we find that the evidence in this matter is legally insufficient to convict Defendant of issuing worthless checks and that Defendant’s assignment of error regarding sufficiency of evidence has merit. In light of this conclusion, we pre-termit any discussion of Defendant’s remaining assignments of error.

CONCLUSION

For the foregoing reasons, we reverse the conviction and sentence of Defendant, Patrick Randall Davis, and discharge him.
CONVICTION AND SENTENCE REVERSED AND DEFENDANT DISCHARGED.

. Because of the previous ruling on the motion in limine regarding references to the "worthless checks,” the trial court disallowed the letter into evidence. The letter was proffered by the state, but its exclusion was not challenged on appeal. The trial court allowed Mondello to testify that he issued the demand letter to Defendant at his address in Texas and that he received a reply.