DREW, J.
h Keith Martin was convicted of two counts of second degree murder for killing the mother and grandmother of his children.
The jury heard direct testimony from the defendant’s much-convicted brother, Jasper Martin, who claimed to have bought the defendant a Glock semi-automatic pistol only days before the slaughter. Jasper also claimed to be an eyewitness to part of the crime and an ear witness to all of it.
The jury was faced with a virtual mountain of circumstantial evidence pointing directly at the defendant, and no one else.
Keith Martin was convicted 11-1 on both counts, and sentenced to concurrent life sentences at hard labor without benefits.
This appeal alleges only the insufficiency of the evidence. We affirm.
TESTIMONY
Toinette Anthony, Linda Taylor’s sister,[1] testified that about 1:15 p.m. on Saturday, February 19, 2011, she walked to her sister’s Shreveport home to get a ride. Through a partially open door, she saw Linda’s body on the kitchen floor. She and a neighbor, Joyce Rice, went back and found Rashonda’s body in a back bedroom. Rice’s sister called 911.
Robert Webster, a detective with the Shreveport Police Department (“SPD”), testified that:
• on that Saturday afternoon, he responded to 4129 Baxter Street;
• he noticed that a hinge from the carport door was on the ground;
• a woman was lying in a pool of blood in the kitchen;'
• another woman was lying face down in one of the bedrooms;
k* the lights in the bedroom were off, but the TV was still on; and
• he secured the scene and left when backup police officers arrived.
Tracy Mendels, a SPD crime scene investigator, testified that:
• he collected evidence and took photographs at 4129 Baxter Street;
• he discovered three 9 mm shell casings and a fully loaded .380 semi-automatic handgun[2] on the ground near Linda Taylor’s body;
*848 • two 9 mm shell casings and a bullet were near Rashonda’s body;
• after her body was removed by a coroner’s representative, he cut out the carpet beneath where her body had lain and found a distorted projectile as well as small pieces of jacketing from a bullet; and
• he took a photograph of the footprint on the carport door.
Carla White, firearms examiner at the North Louisiana Crime Lab, received seven cartridge casings and two bullet projectiles from the crime scene, as well as three bullets and jacket fragments taken by the coroner from the bodies of the victims. Her opinion was that each of the casings was fired from one Glock semi-automatic pistol.
Dr. Jessica Esparza, a DNA technical' leader and forensic scientist at the North Louisiana Crime Lab, testified that she was the DNA analyst assigned to Keith’s case. She received 43 pieces of evidence for analysis. Despite performing many tests, nothing probative was revealed.
Dr. Long Jin, a forensic pathologist, testified that:
• he performed an autopsy on the body of Linda Taylor;
• Linda died from four gunshot wounds to her torso and extremities;[3]
h* he also performed an autopsy on the body of Rashonda Taylor;
• Rashonda was shot four times in her face and torso;[4] and
• the two women each died within three to five minutes of being shot.[5]
Kim Thomas, Linda’s neighbor, testified that she heard gunfire in the neighborhood between 2:00 and 2:30 a.m. on that Saturday morning.
Sonja Taylor testified that:
• she was married to Rashonda’s brother, and had known Linda, Rashonda, and Keith for 18 years;
• Rashonda and Jasper Martin had a friendly relationship;
• after SPD left the scene, she went to get clothing for the children;
• Linda’s wallet[6] and her jewelry, TV, and laptop were in plain view;
• on two or three occasions she had seen bruises on Rashonda;[7]
• in late 2010, she noticed that Rashonda had a bruise on her thigh;
• at other times, she saw bruises on Ra-shonda’s arm and under her eye;
• Rashonda and Keith lived together, off and on, with their children;
*849 • in 2009, she saw Rashonda and' the children at Wal-Mart;
• at that time, Rashonda was apparently hiding from Keith;
• she and her husband took Rashonda and the kids to. a hotel and 1 ¿registered her under an assumed name, to protect her from Keith;
• Rashonda and the children stayed at the hotel for two weeks;
• Keith called her during this time, trying to find Rashonda;
• when she denied knowing her whereabouts, he made a threat;[8]
• on August 7, 2009, Rashonda filed for a restraining order against Keith, though she soon reconciled with him;
• Rashonda lived with her mother on this occasion for a continuous three weeks before the two of them were killed;
• one week before the crimes, Rashonda asked Sonja to listen to a tape recording of an argument between Rashonda and Keith; and
• Rashonda told her that she planned on taking the tape to the police.
The recording was played in open court.[9]
Officer Mike Warren, a Shreveport police officer, testified that:
• in 2010, he responded to 8117 Hobbs Drive about a 911 hang-up call;
• Rashonda Taylor, Keith Martin, and their two children were at home;
• both Rashonda and Keith were out of breath;
• he felt that something had happened but made no arrests;
• he told Rashonda that she could seek a protective order and go to the YWCA, which offered -a place for battered women to stay; and
• both parties denied fighting, but as he was leaving, Rashonda told him privately that she was “terrified” of Keith.
Yivica Fisher testified that:
• she was Rashonda’s childhood friend;
⅜* Rashonda and Keith started dating in ' high school;
• she lived with the couple for almost a year in 2002;
• she last saw Rashonda four days before her murder; and
• she never saw Keith hit Rashonda, but he was verbally abusive.[10]
Sandra Robertson, Rashonda’s coworker, testified that:
• she saw scratches on Rashonda’s face occasionally;
• Rashonda left Keith twice, first in either 2008 or 2009;
• she left again on January 29, 2011, moving in with her mother;[11]
• Keith would often come to Rashonda’s work; and
*850 • Rashonda was afraid of him, but was apathetic about the relationship.
Rodney Taylor[12] testified that:
• he had known Keith for 17 years and they had been good friends;
• on January 29, 2011, Rashonda calléd him and his mother, on a three-way call and they listened to an argument with Keith;
• Rashonda told Keith that she wanted to go out for her birthday;
• Keith replied: “I’ll beat your ass if you try to leave here”;
• that night, Linda picked up Rashonda, who moved in with her;
• he once saw a bruise on Rashonda’s right shoulder;
• Keith showed him a hole in the wall of the house on Hobbs Drive, telling him that Rashonda had pushed him against the wall; but
• he concluded from the location, height, and nature of the indentation |fithat it was more likely made by Rashonda’s body.
Justin Gueory, Rashonda’s coworker at Lowe’s, testified that:
• he had worked with Rashonda for six years, during which time they had dated for five years;
• he knew Rashonda was involved with Keith;
• he stopped dating her when she told him she was marrying Keith;[13]
• he later resumed dating Rashonda after no' marriage occurred;
• in 2010, Keith found out about him and Rashonda;
• after he got a text from Rashonda saying that she loved and missed him, he had a missed call and a threatening voice mail;[14]
• after the phone call, Rashonda missed two or three days of work;
• she returned, with scratches on her neck and a bruise on her eye;
• he spoke to Rashonda several times on February 18, 2011;
• they argued because Rashonda was angry about him giving the mother of his children a ride home from work;
• he did not kill Rashonda Taylor or Linda Taylor; and
• Rashonda sent him a last text just before 10:00 p.m. on February 18.[15]
Malshondra Horton also worked at Lowe’s. She saw a bruise on Rashonda’s arm and scratches on her arm and neck. While at work in 2009, she heard Keith, via speaker phone, threaten Rashonda.[16]
17SPP Detective Kevin Strickland testified that:
• on February 19, 2011, he investigated the murders on Baxter Street;
• he noticed that the door in the carport had been forced open;
• there did not appear to be anything missing from the house;
*851 • he learned that Rashonda had moved in with her mother to get away from Keith, who was the father of her children,
• on the Saturday when the bodies were found, Keith, Jasper, and the children were taken to the police station for questioning;
• he explained to Keith his Miranda[17] rights; and
• Keith voluntarily agreed to speak to Detective Strickland.[18]
In this first interview, Keith gave his version of events.[19]
When he gave consent for a search of his home at 8117 Hobbs Drive, the interview was paused, then later resumed. Keith did not seem upset about Rashon-da’s death and he never volunteered that she had another boyfriend. Strickland explained that Keith’s mother was in the process of moving from Tate Street, which is close to Baxter Street. He further | ^testified that Disco 9000 is not far from Baxter Street.
In the second interview, Keith admitted that he called Rashonda “all the time,” including that morning. He admitted a nonphysical argument with her on January 29, 2011, after which she left him. He denied any knowledge of a 911 call from 4129 Baxter Street in 2010.[20]
Keith further told Strickland that:
• Rashonda had a boyfriend, but denied knowing his name;
• the cuts on his hand were old;
• he got home close to daylight;
• he did not go back to Linda’s house after picking up his children; and
• he had no idea who killed Linda and Rashonda.
Det. Strickland testified that the cut on Keith’s hand was between his thumb and index finger, an injury he had often seen when a person fired a semi-automatic while holding it improperly. Linda and Rashonda were killed by a Glock 9 mm semi-automatic firearm.
Det. Strickland searched Rashonda’s Droid and Keith’s iPhone. On the iPhone, he found three photos of two loaded magazines and a Glock handgun, sent to Keith by Jasper three days before the murders.[21]
*852 On the same day, Jasper told the detective that:
• on February 18, he and Keith had gone out to Disco 9000;
• Keith left Disco 9000 between 1:40 and 1:50 a.m.; and
• when the club closed at 2:15 a.m., he went to Tate Street; he later | ^went with Keith to Overtime Bar.[22]
Rashonda’s friends and family confirmed Keith’s past abuse.[23]
In Det. Strickland’s next interview with Keith, he asked about the Glock photo. Keith: (1) said Jasper sent him that photo; (2) denied any part in the killings; and (3) said that Jasper had no gun that night.
Keith allowed a DNA swab and made a fourth statement to Strickland,[24] claiming that he picked up his kids after leaving Disco 9000.
Strickland confronted him about Jasper having said that:
• Keith picked up his children before going to Disco 9000;
• Keith left Disco 9000 alone at 1:50 a.m.;[25]
• he (Jasper) left at 2:15 a.m., then went to their mother’s home; and
• Keith had the Glock on him on February 18, 2011.
Keith denied having the gun and denied leaving Disco 9000 at 1:50 a.m. He said that he was drunk and could not recall specific times, but denied getting his kids before going to Disco 9000.
Det. Strickland obtained a search warrant for Keith’s mother’s house on Tate Street, hoping to find the murder weapon. It was not there. Another firearm was found, however, and since Jasper lived there, he was arrested for the crime of being a felon in possession of a firearm.
Jasper then came clean with the detective, testifying that:
lin* after he left Disco 9000, he went to his mother’s Tate Street home;
• Keith appeared agitated and kept coming in and out of the house;
• Keith asked Jasper to walk with him so he could clear his head;
• they went to Baxter Street and stopped across the street from Linda’s;
• Keith suddenly ran to the house and kicked open the carport door;
• he followed Keith, but never entered the house;
• he saw Linda and Keith struggle, then saw the flash from a gun;
• when Linda fell to the floor, he heard Rashonda screaming; and
• he then heard more shots as he ran back to his house on Tate Street.
Jasper never asked for a deal and he gave nonpublic crime details.
The SPD arrested Keith Martin for the murders.
Det. Strickland also verified that Keith called his mother, Ida Dumas, at 2:14, 2:17, and 2:28 a.m. to see if she would watch the children. Dumas then came and picked up the children and took them to her home on *853 Victory Drive, about an 11-minute ride from the Tate Street house.
Det. Strickland explained that the time of death was roughly based on the statement of Linda’s neighbor, Kim Thomas, who heard gunshots between 2:00 and 2:30 a.m. on February 19, 2011.
Det. Strickland said Keith made dozens of phone calls to Rashonda[26] |nduring the evening of Friday, February 18, 2011, through the early morning hours of February 19, 2011. The calls abruptly stopped at 2:37 a.m.
SPD Sergeant Danny Duddy drew a diagram of the crime scene.
Ratish Upadhyay, an AT & T engineer, was accepted as an expert and testified regarding Keith’s cell phone usage, which provided information on the date, time, and duration of all calls made or received on his cell phone. The records also reflected which cell phone tower and location area code were used by Keith’s cell phone during the many calls.
Upadhyay explained that when a cell phone user makes a phone call or sends a text message, the cell phone searches for the nearest operating cell phone tower and “hits” the nearest side of that tower, which accepts information from the phone.
Upadhyay testified that the last cell phone call Keith made to Rashonda was at 2:37 a.m., and was made from a location near Baxter Street. The next communication from Keith to Rashonda was a text sent at 5:09 a.m., made from a downtown Shreveport tower.[27]
Sergeant Robert Garner, an expert in cell phone forensics with the Bossier City Marshal’s Office, testified that:
• in February 2011, he received, examined, and collected data from one cell phone owned by Keith, and another owned by Rashonda;
• he collected call logs, text messages, the calendar, the ring tone, |1?notes, WiFi information,[28] location maps, and a dictionary;
• he explained that his office utilizes a device known as a Cellebrite machine to process cell phones;
• his office also uses a Lantern software program to process iPhones;
• he identified his report, which showed the location data for the cell phone towers used by Keith’s cell phone;
*854 • harvested location data collected could not be used to determine Keith’s specific location at any time;
•'he identified a second Lantern report, which was made after a second search of defendant’s cell phone in November 2012;
• the second Lantern report revealed attachments to all text messages;
• he retrieved the photographs of the 9 mm Gloek handgun from Keith’s cell phone;
• based on his examination of Keith’s WiFi data, he connected to a wireless network at Overtime Bar at 4:41 a.m. on February 19, 2011;
• he identified the February 2011 Celle-brite report, which displayed text messages to and from Keith’s cell phone, with dates and times;
• he made a similar report relative to Ra-shonda’s cell phone;[29]
• many calls made on February 18 and 19 lasted only a second or two;
• his conclusion was that Rashonda was hanging up on Keith;
• Rashonda last called Keith at 10:36 p.m. on February 18 and sent him no text messages after that point;
• he identified the photographs that Jasper sent his brother of the 9 mm dock handgun and magazines;
[i3* the report showed that Keith sent a text to Jasper: “I like that, legal”;
• Jasper texted that he paid $400.00 for the gun;
• a second page of the Lantern report displayed text messages to and from Keith’s cell phone on February 18, 2011;
• most of the texts were to or from Ra-shonda; [30]
• Keith called Linda Taylor[31] at 2:11 a.m. on February 19, 2011;
• incredibly, Keith made over 100 cell phone calls to Rashonda on February 18 and the first two hours and 37 minutes of February 19;
• for 152 minutes thereafter, Keith made no calls and sent no texts;
• at 5:09 a.m., Keith started sending Ra-shonda texts,[32] the first saying “U know this s* *t have to stop fatty”; and
• he identified two pages of the Cellebrite report displaying text messages to and from Rashonda’s cell phone on the two dates.
Ronnie Gryder testified that:
• he once served as an officer of the Shreveport Police Department;
• at the time of trial, he was an investigator for the Caddo DA’s Office;
• he was tasked to find Jasper Martin after he failed to show up for Keith’s previously scheduled trial date;
• this he did, through help from the United States Marshal’s Office and the violent crime task force group;
• Jasper was hiding in an attic and was arrested for failing to appear;
*855 • Keith’s injury to the webbing between thumb and index finger was likely caused by firing a Glock when holding the firearm improperly;
• he has suffered the same injury on three separate occasions;
• in none of those occasions did he drop his weapon when he was cut;
|14* he created a list of text messages and phone calls between Keith and Rashonda, and compared the list with the display of cell phone towers explained in the trial testimony of the AT & T engineer;
• he went through the text messages and phone calls, explaining Keith’s location based on what cell phone towers were used;
• he showed that Keith called Rashonda numerous times the evening of February 18, 2011, but most of the calls lasted only seconds;
• at 8:23 p.m. Keith sent Rashonda a text message which stated, “Where are my kids! I’m ready to get them! Been calling ur phone”;
• after this point, dozens of phone calls were made from Keith to Rashonda, until the last call was made at 2:37 a.m.;
• for 152 minutes, there was no communication between the two;
• at 5:09 a.m., Keith began sending text messages to Rashonda;'
• in fact, Keith sent a total of five texts to Rashonda’s phone during the six minutes from 5:09 a.m. until 5:15 a.m., with all texts being transmitted from downtown Shreveport; and
• from there, Keith’s text messages and phone calls indicated that he moved to near Victory Street and then near Hobbs Drive.
Jasper Martin was a very reluctant witness. He testified that:
• he was in jail for failing to appear for Keith’s previous trial;
• he has eight children by eight different women;
• though unemployed, he took odd jobs to support his kids;
• in February of 2011, he was living in Mansfield with his girlfriend;
• sometimes he would stay with his mother on Tate Street;
• he had been convicted of numerous crimes;[33]
• he was arrested a few days after Ra-shonda’s murder as a felon in 115unlawful possession of a firearm, based upon the police finding a gun when searching his mother’s home during their investigation; [34]
• he met Rashonda in high school, had a “good” relationship with her, and had never gotten into a disagreement with her;
• he had been to Keith and Rashonda’s house only a few times and had been to Linda’s house maybe one time;
• he denied that Keith and Rashonda had a troubled relationship and was unaware that Rashonda had left Keith at the time of her death;
• he was not very close to Keith, seeing him only occasionally;
• a few days before Rashonda and Linda were murdered, he purchased a 9 mm Glock firearm from Antonio Newson;
*856 • he bought the gun because Keith asked him to find it so that he could resell the firearm to another customer;
• shortly after Keith made this request, Newson drove by his mother’s house and asked him if he knew anyone who needed a gun;
• he took a picture of one of the guns Newson was selling — a 9 mm Glock firearm — -and sent it to Keith via text message;
• he lied to Keith about the price paid for, and registration of, the gun;
• Keith soon came and got the gun from him after work;
• he admitted initially lying to the police about where he got the gun;
• on February 18, 2011, he was with Nadia Cannon, the mother of one of his children, in the Cedar Grove area of Shreveport;
• he, Cannon, and their daughter then went to Jasper’s mother’s house at approximately 8:00 or 9:00 p.m.;
• a short time later, Keith came over and was “in and out;”
• Keith got his hair cut by “Little Roy” on Martha Street;
• after Cannon left with the baby, he walked down to Little Roy’s house to meet Keith, but he was not there;
• he found out that Keith had left in someone else’s car and so he and | ^Little Roy walked to a church to get Keith’s truck;
• the two men took Keith’s truck to a club called Pat & Jerry’s, where they met up with Keith;
• the three men left in Keith’s truck and went to a liquor store;
• they arrived at Disco 9000 at approximately 11:00 p.m.;
• he had only one drink at Disco 9000, but Keith appeared to be drunk;
• Keith left without him, came back, and left again at 1:45 a.m.
• the club closed at 2:00 a.m., whereupon the patrons congregated in the club’s parking lot to talk for about a half an hour;
• he left Disco 9000 with his friends, Joe and Chad, in Joe’s car and went to his mother’s house on Tate Street.
• a short time later, an intoxicated Keith arrived at his mother’s house and asked Jasper to walk with him;
• he could not recall exactly what Keith was wearing when they went for the walk, and he did not know that Keith had a gun on him;
• the two brothers silently walked down Tate Street to Bellar Street, and then to Baxter Street, across the street from Linda’s house;
• Keith suddenly broke out running toward Linda’s house, ran up under the carport and Jasper heard a “boom” sound;
• he could not see Keith kick open the door because there was a large SUV parked under the carport;
• when he crept to the driver’s side of the SUV, he saw Keith wrestling with Linda in the kitchen, then saw her get shot by Keith;
• Keith then ran down the hallway, out of Jasper’s sight;
• he heard a “bump” sound and then he started running;
• when he reached the sidewalk, he heard more gunshots;
• he ran back to his mother’s house, but did not call police because he was scared that he would get in trouble due to his criminal record;
• Keith returned to his mother’s house some time later, and Jasper asked Keith, “Why the hell did he do that, what the hell is going on?”;
*857 Ii7* Keith did not answer, just saying, “Be cool, it’s going to be okay”;
• Keith tried to use Jasper’s shirt to wrap the gun, but Jasper took his shirt back and put it on; Keith then took the gun out to his truck;
• he and Keith then left to go to the house on Victory Street and, with the help of Keith’s children, loaded up a van;
• he saw Keith digging in the backyard, but saw no gun buried;
• the two men then went together to Overtime Bar;
• he called his other brother, Derrick, while he was at the bar, told him what Keith had done, and asked him to come and pick him up;
• Derrick drove to the bar and gave both Jasper and Keith a ride to Martha Street and then back to their mother’s house on Tate Street;
• Jasper went to spend the night with the mother of one of his babies;
• the next day, Keith and his children picked him up at their mother’s house and took him to a Circle K store on Pines Road;
• they returned to Keith’s house, where the police were waiting; and
• he admitted that the first time he was interviewed by police, he told them that he knew nothing about Linda’s or Ra-shonda’s murders.
Anthony Newson admitted selling the Glock to Jasper.
By an 11-1 vote, the jury found Keith guilty of both counts of second degree murder. Following denial of a motion for new trial and motion for post verdict judgment of acquittal, he was sentenced as noted before.
DISCUSSION
The defendant assigns one error: insufficiency of the evidence. Our law on the analysis of such claims is well settled.[35]
1 lsANALYSIS
There is direct evidence of the murders from Keith’s own brother, admittedly a man with a checkered past.
There is a mountain of circumstantial évidence here. Consider:
*858 • Based on the valuables ignored and the “over-killing,” these murders were grounded in passion and rage, as opposed to a property crime.
• Keith had a history of abuse and threats against Rashonda.
• Keith had a history of threats against Linda.
• The time frame fits, as evidenced by the testimony of Kim Thomas, Jasper Martin, as well as the cell phone records.
• Rashonda quickly hung up on Keith during many of his dozens of calls made between 1:17 and 2:37 a.m.
• Keith’s 50 calls in 80 minutes tracked his route to the abattoir.[36]
• The cut on Keith’s' hand was circumstantial evidence that he had recently fired a Glock while gripping it incorrectly.
• After his 2:37 a.m. phone call, he made no calls and sent no texts for 2 ½ hours, one possible inference being that he knew no one was left alive to answer the phone.
[i9* Starting at 5:09 a.m., his five texts in five minutes, could lead to another reasonable inference that his intent was to fabricate an alibi of attempted communication with two women he knew he had just executed earlier that morning.
The jury’s verdicts are clearly supported by this voluminous record.
DECREE
The defendant’s convictions and sentences are AFFIRMED.

. Toinette Anthony was thus the aunt of Ra-shonda Taylor.

. This firearm was not the murder weapon, which was never found.

. Linda was shot in the shoulder. That bullet penetrated her left chest wall, left lung, and right lung. Another bullet went through her back, spine, diaphragm, and liver. She was also shot in the forearm and in the right upper leg.

. One bullet tore through the left side of Ra-shonda’s face, went through her tongue, and lodged in the right side of her face. She was also shot in the shoulder and her right upper back. The bullet that entered her body through her shoulder perforated her right lung and also lacerated the thoracic aorta. Another bullet went through her lower back, through the surface of her left kidney, and perforated her spleen, pancreas, stomach, and the left lobe of her liver. A last bullet struck Rashonda’s groin area.

. Dr. Jin was unable to fix an exact time of death.

. Inside Linda's wallet was a $100 bill and her bank card. The items of value left behind would preponderate that this was not a property crime. Likewise, the ‘'overkill” of these eight wounds would indicate crimes of passion and hate.

. A Prieur hearing was conducted, after which the trial court ruled that the state could introduce evidence of the defendant’s previous threats and abuse of Rashonda.

. Keith’s 2009 telephonic threat was: "I know where she’s at. She’s with your b* ⅝ *b ass mother-in-law. I’m going to go f* *k both of them up.”

. On the tape, a man and a woman are heard in the background arguing over a telephone call the woman had received. At one point the man said that he was going to find the man that called, but told the woman that "I’m gonna f* *k you up first.” After the recording was played in court, Sonja identified the man in the recording as Keith and the woman as Rashonda. Sonja said that she also heard the couple arguing in 2010.

. Fisher recalled an incident in 2009, when Keith accused Rashonda of cheating and called her names. She defended Rashonda and told him not to talk that way in front of his children. Keith responded by telling Fisher that she could not come back to their house and then threatened to throw both of the women out of his truck.

. Three weeks later, Rashonda and her mother were dead.

. Rodney Taylor is Linda’s son, Rashonda's brother, and Sonja's husband.

. She never married Keith.

. "Hey, home boy, this is Rashonda’s boyfriend. I just finished whooping her ass and if you want to meet somewhere, I'm going to whoop yours, too.”

. This was apparently the 3:48 a.m. Greenwich Mean Time ("GMT”) text by Rashonda to Gueory that was actually sent during the Central Standard Time (“CST") time frame given by Gueory.

."You're not leaving me. No one's leaving anybody. I’ll kill you, your momma, your brothers, because I know where they work. I know where they stay. I'll kill you, myself, and the kids.”

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The defendant filed motions to suppress all four of his statements and other related evidence; all of his motions were denied. He sought supervisory review of the trial court's refusal to suppress the evidence. This court denied his writ.

. He said that on February 18, 2011, he was on Martha Street around 6:00 p.m., got a haircut, and then went home to change clothes at about 10:00 p.m. He then went to a club. Disco 9000, with his brother, Jasper Martin. They left the club late and went to their mother’s house, where he called Ra-shonda. When she didn’t answer, he called Linda, who told him that Rashonda was asleep. He asked if he could come and get his kids and Linda said he could, so he went and got the children. He then returned to his mother's house, left the kids with her and went to another club, Overtime Bar, with Jasper. He and Jasper got drunk and his little brother, Derrick, picked them up. Derrick also drove him and his children back home for the night. He woke up the following morning and his brother drove him to get his truck. He then drove to a Circle K store and then back home. Keith admitted that his relationship with Rashonda was bumpy, and that she would sometimes stay with her mother. He further admitted making threats to Rashonda, but denied threatening to kill her. He also denied killing her, saying that the last time he talked to her was between 10:00 p.m. and midnight.

. This is the call about which SPD Officer Mike Warren testified at trial.

. The text messages were sent on February 16, 2011. Keith to Jasper: "I like that. Legal.” Jasper to Keith: "I paid 400 for it;” and “it’s in my baby’s moma’s name.”

. The drive from Disco 9000 to 4129 Baxter was less than two minutes. A video from Overtime Bar showed the two men arriving at 4:20 a.m., and leaving at 5:06 a.m.

. Rashonda secured a temporary restraining order against Keith in August, 2009. At the injunction hearing, each of them appeared. The hearing was continued until September. When Rashonda did not show up, the case was dismissed.

. All four of the defendant’s statements were played in open court.

. Roy Robinson told Det. Strickland that the brothers left Disco 9000 together.

.FOUR TIME FRAMES RELATIVE TO PHONE RECORDS:
I. On Friday, from 6:00 p.m. until midnight, Keith called Rashonda 85 times and text-ed her once (at 8:23 p.m.). During this same six-hour period, Rashonda called Keith six times in 70 minutes. Her last call to him was at 10:36 p.m. There is no record of Rashonda ever again trying to communicate with Keith.
II. In a 154-minute period on Saturday, February 19, from 12:03 until 2:37 a.m., Keith sent no texts, but called Rashonda 36 times.
III. From 2:37 until 5:09 a.m., no calls or texts were made. The state argues that this is the exact time frame during which the murders were committed.
IV. At 5:09 a.m., he sent five, taxis in five minutes. Over the next 33 minutes, he made six calls and sent 10 texts. The average duration of these calls was six seconds.

. A map of the Shreveport cell phone tower locations was admitted. Another exhibit reflected the times of Keith's cell phone calls and texts to Rashonda. Predicated upon which cell tower received the information for each transmission, it was possible for the expert to provide testimony as to Keith’s general location as he made each text or call. Upa-dhyay extrapolated this information in tracking Martin's rough route to the general area of Baxter Street, immediately before the murders occurred.

. WiFi enables a cell phone to connect wire-lessly to an Internet source through a wireless network, without expending Internet time purchased by the user.

.This was confusing. The Cellebrite report used GMT, which is six hours ahead of CST. Rashonda’s phone usually converted the time to CST, but sometimes it did not. Keith's phone always reflected GMT, as it never automatically corrected, meaning that his phone always reflected a time actually six hours later than CST. The correct CST of at least one of Rashonda's texts had to be extrapolated in context with testimony from Justin Gueory.

. Rashonda was listed in Keith's cell phone as "Big Momma."

. Linda was listed in Keith’s cell phone as “Faye.”

. Keith’s abrupt switch to texts could lead to a macabre inference that he was trying to establish a plausible story that he did not know the two women were dead.

. His convictions: (1) simple battery and simple criminal damage to property in 1998; (2) remaining after being forbidden in 1999; (3) criminal trespass in 2000; (4) simple battery in 2001; (4) illegal possession of stolen things in 2001; (5) first degree robbery in 2002; and (6) simple battery and simple assault in 2005.

. The charge was later dismissed.

. The standard of appellate review for a sufficiency of the evidence claim is “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hearold, 603 So.2d 731 (La.1992). This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517.
The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. State v. Casey, 1999-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). A reviewing court may not impinge on the fact finder's discretion unless it is necessary to guarantee the fundamental due process of law. Id. The appellate court does not assess credibility or reweigh the evidence. State v. Smith, 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 2002-3090 (La. 11/14/03), 858 So.2d 422.
The Jackson rationale requires that the state negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Hughes, 2005-0992 (La. 11/29/06), 943 So.2d 1047, (citing State v. Weary, 2003-3067 (La.4/24/06), 931 So.2d 297, and State v. Neal, 2000-0674 (La.6/29/01), 796 So.2d 649). Positive identification by only one witness is sufficient to support a defendant's conviction. Id.

. Keith Martin traced his own route to the killing zone by his minute-by-minute cell phone calls tracked his route through analysis of the cell phone towers handling his frenzied efforts to call Rashonda. In other words, he largely convicted himself.