BROWN, Chief Judge.
|! Defendant, Demario Thomas, was charged by indictment with the first degree murder of Gregory Scott Bowers which occurred on July 21, 2010. The indictment was amended to charge defendant with second degree murder. A jury found defendant guilty and thereafter he was sentenced to the statutorily mandated life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant has appealed, urging that the evidence was insufficient to support the conviction. We affirm defendant’s conviction and sentence.

Discussion

Defendant contends that the state failed to present sufficient evidence to prove that he murdered Gregory Scott Bowers. Defendant contends that the state failed to prove beyond a reasonable doubt that he committed the charged offense. According to defendant, the evidence at trial showed that it is more likely that defendant’s cousin, Kendrick Thomas, committed the crime. Defendant claims that he was only involved in the robbery of the victim, not the homicide.
Dr. James Traylor, an associate professor with the Department of Pathology at the LSU Health Sciences Center and director of Autopsy and Forensic Services, testified that he conducted the autopsy of the victim, Gregory Scott Bowers. Dr. Traylor observed that Mr. Bowers was an obese, 44-year-old man. The victim suffered 53 sharp force injuries. Most were knife wounds in the victim’s back, and six were stab wounds in the anterior portion of his upper left arm. The most serious was to the left brachial artery, which is one of the major arteries in the upper left arm. The |2mechanism of death was ex-sanguination, meaning Mr. Bowers bled to death. Dr. Traylor concluded that the stab wounds were caused by a single-edged blade.
In open court, Dr. Traylor identified a photograph of defendant’s hand at the time of his arrest. Defendant had an injury to his hand, an incised or sharp-force injury. Dr. Traylor explained that when a person is stabbing someone, there is blood involved; this blood gets on the blade as well as on the assailant’s hand, and things become slippery. This may cause the assailant to inadvertently slip, which can cause the blade to go up and cut the palmar surface of the perpetrator’s hand. Significantly, the knife used in the murder was recovered, and defendant’s DNA was found on the knife.
Sergeant Skylar VanZandt of the Shreveport Police Department, an expert in the area of certified latent print examination and crime scene analysis, testified that on the evening in question, he was dispatched to the Plantation Inn Motel to a first floor apartment that consisted of two adjoining rooms. Sgt. VanZandt did a walk through of the rooms, had the scene vacated and began taking photographs and video. Sgt. VanZandt identified photos in open court of the crime scene that depicted the location of the victim’s body as well as the knife used in the crime. Sergeant VanZandt testified that the victim’s shirt had been ripped open and that buttons were scattered all over, indicating a struggle between Mr. Bowers and his killer. During Sergeant VanZandt’s search of the room, he located a blood-stained opened knife on top of clothes to the right of a chair and to | sthe right of the door. The knife was determined to be a Smith & Wesson lock blade. Sgt. VanZandt identified a knife in court as the knife collected at the scene of the crime.
Additionally, Sergeant VanZandt assisted with the identification of latent prints found on the scene and on the victim’s *791 recovered vehicle. Sgt. VanZandt was unable to identify any fingerprints other than the victim’s at the actual crime scene. The victim’s vehicle was found parked two or three miles from the crime scene. Sergeant VanZandt was able to identify two prints from the victim’s recovered vehicle. One print was located on the passenger’s side door and belonged to a black female. The other print was located on the left side of the trunk and belonged to defendant’s cousin, Kendrick Thomas.
Corporal Tracy Mendels of the Shreveport Police Department CSI Unit testified that she assisted with videoing and photographing the crime scene. Corporal Men-dels took DNA swabs of the blood smears, droppings, transfers, and the knife. Corporal Mendels also processed the victim’s recovered vehicle. There were blood smears located on the steering wheel of the vehicle, on the armrest, on the door latch of the inside passenger door lock and on the inside door panel on the driver’s door.
Katonya Davis, defendant’s aunt, and Karen Thomas, defendant’s mother, both worked at the Plantation Inn Motel and were friends with the victim, who went by his middle name, which was “Scott.” Sometime after learning of the murder, Ms. Davis and Ms. Thomas saw defendant, Demario Thomas, at his mother’s house. Ms. Davis observed defendant wearing two 14chains that looked similar to chains that the victim owned. When asked to tell what he knew about the murder, defendant did not give them a definitive answer.
Ms. Davis and Ms. Thomas ran into Akeem Harvey, who was wearing a necklace with a medallion on it that appeared to be a necklace that Ms. Davis knew was owned by the victim, Scott Bowers. Ms. Thomas’s daughter, Klydetra, gave her a bag that contained a camera and watch which Ms. Davis recognized as items that belonged to the victim. The two sisters brought this bag with them to the police station. They informed Detective Rod Johnson that they thought that their relative, Demario Thomas, knew something about what had happened to Scott Bowers. In court, Ms. Davis identified the camera and watch that were inside of the bag given to Karen Thomas by her daughter and the necklace she had seen Akeem Harvey wearing.
On cross-examination, Karen Thomas testified that she met the victim in 2005. He became close with her children after their father was killed. Ms. Thomas stated that the victim, Scott Bowers, was helping defendant market a rap CD. Karen Thomas testified that she did not think that defendant killed Scott Bowers. She thought only that he knew something about the murder. Ms. Thomas opined that her nephew, Kendrick Thomas, had something to do with Scott Bowers’ murder.
Sarah Yates, owner of B & B Used Cars, testified that Scott Bowers began working for B & B Used Cars in 2003. According to Ms. Yates, Scott Bowers was a trusted employee; he had the safe combination, the keys to all |fidoors, and he knew the security codes. Some times he would go to auctions for the business and purchase cars. Also, occasionally at the end of the work day, he left the lot with a significant amount of money to be deposited the next day. Mr. Bowers always called Ms. Yates’ husband to inform him of the amount of money he had and that he would deposit it the next day. Ms. Yates described Scott Bowers as a responsible, polite man who was considered to be a part of their family. When she learned of his murder, she provided the VIN number for the victim’s missing vehicle to the police. In open court, Ms. Yates identified a photograph of a watch collected in evi *792 dence as one belonging to Scott Bowers. She also identified photos of items of jewelry that belonged to the victim.
Audra Williams, a forensic analyst,'FBI quality assurance standards auditor, and local CODIS manager of the North Louisiana Crime'Lab, 'testified that she performed DNA tests on items seized as part of the ’ investigation. ■ Ms. Williams obtained reference samples of the victim, Gregory Scott Bowers, defendant, Demar-io Thomas, his cousin, Kendrick Thomas, and Akeem Harvey. < . ■
The DNA profile obtained from' the swab of suspected blood from the end table outside drawer located in the victim’s room was consistent with the reference sample from defendant, Demario Thomas. The probability that the profile came from someone other than defendant was approximately one in 169 quadrillion. The victim, Kendrick, and Akeem were excluded-as being donors of this DNA. The DNA profile obtained from the swab of suspected blood from the top drawer side table was consistent with being a | (¡mixture of DNA from at least two individuals, one major contributor and one minor contributor. Defendant could not be excluded as the major contributor of the DNA in the mixture. The profile of the minor contributor could not be obtained. The probability that the profile of the major contributor came from someone other than defendant was approximately .one in .169 quadrillion. The victim, Kendrick, and Akeem were excluded as being the major contributors of DNA.
The DNA profile obtained from the swab of suspected blood from the knife, in test area one, which is from one side of the knife handle, was consistent with being a mixture of DNA from at least two individuals. The victim, Kendrick, and defendant could not be excluded as being, the donors of the DNA in the mixture. Akeem Harvey was excluded as being a donor. Approximately 96.4 percent of the population could be excluded as being a possible, contributor of the DNA in the mixture. Ms. Williams explained that she could see that Demario and Kendrick Thomas were related from examining their genetic DNA profile. Although there was-only a mixture of DNA from two individuals, three individuals were listed because of the familial relationship between Kendrick and defendant as shown by their-DNA. ' '
The ' DNA profile obtained from the swab of suspected blood from the knife, test area two, which is taken from the axle of the knife,’- was consistent with being a mixture of DNA from at least two' individuals', one major contributor and at least one minor contributor. The’ victim could not-' be excluded as the major contributor of the DNA in the mixture. The ^probability that the profile of the major contributor came from someone other than Gregory'Bowers was one in 83:3 billion. Kendrick Thomas and defendant could not be excluded as being the minor contributor.. Approximately 99.9 percent of the entire population could be excluded as a possible minor contributor.
The DNA profile obtained from the swab of suspected blood from the knife, test area three, which was from the other side of the handle, was consistent with being a mixture of DNA from at least two individuals, one major contributor and one minor contributor. Defendant could not be excluded as being the major contributor of DNA in the mixture. The probability that the profile of the major contributor came from- someone other than defendant was one in-3.07 quadrillion. The victim could not be excluded as being a donor of the DNA in the - mixture. ■ Approximately 97.1 percent of the entire population could be excluded as a possible contributor ■■of DNA. Kendrick Thomas and Akeem Har *793 vey were excluded as being donors of this DNA.
Sergeant Rod Johnson of the Shreveport Police Department. testified that he was the lead detective in this case. Sergeant Johnson identified the camcorder and watch in open court as the items that Ms. Davis and Ms. Thomas brought to police headquarters. Sgt. Johnson testified that the ladies were both certain that the watch belonged to the victim. Sergeant Johnson testified that the watch looked like one seen in photographs on a dresser at the scene of the crime., The women also gave Sergeant Johnson Akeem Harvey’s name as someone else who may have been wearing the |8victim’s jewelry after the homicide. After receiving the above information, Sergeant Johnson went to the Thomas home on Jackson Street in hopes of finding defendant, Ms, Thomas gave. Sgt. Johnson consent to search her residence. Defendant was not at his mother’s home, although his two sisters were. They were interviewed by Sergeant Johnson and confirmed the information given to him by their mother and aunt. Sgt. Johnson then went to Akeem.Har-vey’s residence on Claiborne Street. After some initial resistance, Akeem admitted to knowing Demario Thomas and to having received jewelry from Thomas. Detectives searched Akeem’s residence and found gold chains that had been thrown into the trash can outside of the home. There were more gold chains found inside the home in a black bag in Akeem’s bedroom dresser. Sgt. Johnson collected a bracelet with “Jesus” on it and a chain and a cross from Akeem’s residence. Sgt. Johnson identified the items in open court as those he collected from the house and the trash can.
After defendant was arrested and brought back to headquarters, he was photographed. The pictures show that defendant had cuts on his hands. Defendant was also interviewed after he; was advised of his rights. The recorded interview was played ■ for the jury. In the interview, defendant was asked- .if he was injured in an attack -or while defending himself (referring. to the cuts on his hands) and defendant’s response was “no.” In this, statement, defendant confirmed his involvement in-the robbery with his cousin, Kendrick Thomas, and claimed that Kendrick stabbed the victim. At the conclusion of the interview, defendant was arrested for the murder of the ^victim, Gregory Scott Bowers. Sergeant Johnson subsequently obtained buccal swabs from defendant and his cousin, Kendrick Thomas. When Sgt. Johnson met up with Kendrick Thomas, the officer observed minor scratches on the back of Kendrick’s neck, as well as on his arms and hands. These wounds did.not appear fresh. Based on what they developed during the investigation, Kendrick Thomas was not arrested, but he still remains an active suspect in this case.
The state rested upon conclusion of Sergeant Johnson’s testimony. The defense, called Dr., James Pinkston, a psychologist of LSU Health Sciences Center, as its sole witness. ..‘Dr. Pinkston testified that he was asked .to evaluate defendant on his ability to distinguish right from wrong at the time of the offense and his capacity to understand the proceedings against him. In other words, Dr. Pinkston was asked to evaluate defendant’s sanity and competency, Dr. Pinkston administered general, cognitive functioning tests, psychological functioning, tests and legal competency tests. Defendant presented as having mildly slowed mental processing, word finding problems,' stuttering and mumbling. The results of the cognitive functioning tests showed that defendant’s functioning falls in the low average to average range for cognitive function. Dr. Pinkston *794 explained that the tests in isolation mean very little. Dr. Pinkston opined that defendant’s ability to understand and use his words correctly falls in the borderline range. However, defendant is able to follow simple instructions and is able to make himself understood in a simple context. Defendant can be confusing and it is sometimes hard to understand what he means. Dr. Pinkston testified that | ^defendant understood the charges against him, but had mild impairment regarding his rational understanding of the legal processes, specifically regarding the consequences. Dr. Pinkston ultimately found that defendant was both sane and competent. As it relates to defendant’s statement to police, Dr. Pinkston opined that when defendant said that the crime was supposed to be a robbery, not a murder, defendant’s statement was questionable.
The standard of appellate review for a sufficiency of the evidence claim is well settled. The standard, after viewing the evidence in the light most favorable to the prosecution, is whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[1] This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. The Jackson standard is applicable in cases involving both direct and circumstantial evidence. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. Credibility determinations are the province of the trier of fact.[2]
[nln the case sub judice, for defendant’s conviction to be upheld, the record must establish that the jury’s verdict was reasonably based.
During his statement to Detective Johnson, defendant admitted that he was involved in the robbery of the victim, but that his cousin, Kendrick Thomas, committed the murder. This admission, standing alone, constitutes sufficient evidence to prove that defendant was a principal to the crime of second degree murder. State v. Smith, 47,983 (La.App.2d Cir.05/15/13), 116 So.3d 884. In State v. Smith, the defendant argued that he could not be a principal to the crime of second degree murder because only those persons who knowingly participate in the planning or executing of a crime are principals to that crime. Id. at 899. This Court disagreed, opining that sufficient proof is presented where it is shown that the defendant’s actions were a “contributing cause” or a “substantial factor” in the resulting death of the victim. Id. In the instant case, defendant’s participation in the robbery that resulted in the victim’s death is sufficient support for the conviction of second degree murder.
Additionally, defendant’s DNA was located on the murder weapon. While some of the DNA evidence found on the murder weapon contained contributions from two persons, with both defendant and Kendrick Thomas being included as a possible contributor, Audra Williams testified that Kendrick Thomas was excluded as being a contributor to the DNA analyzed from test *795 area three, which was from one side of the knife handle; defendant, however, was not excluded as being the major contributor, and |iathe probability that the DNA profile of the major contributor was from someone other than defendant was one in 3.07 quadrillion.
Further, at the time of defendant’s arrest, officers recovered jewelry that was identified as belonging to the victim. Specifically, defendant’s own mother and aunt were certain that the watch they turned over to Detective Johnson, which had been given to them by defendant’s sisters, who found it at their home, belonged to Gregory Scott Bowers. Sgt. Johnson also testified that during his interview with Akeem Harvey, Akeem admitted that he knew defendant and received the pieces of the victim’s jewelry that was recovered from him from defendant. Both defendant’s mother and aunt testified that the jewelry that they saw Akeem Harvey wearing belonged to the victim. Defendant’s statement to detectives regarding his participation in the robbery of the victim, together with the DNA evidence, the cut on defendant’s hand and defendant’s possession of the items recovered that belonged to the victim, was sufficient evidence to convict defendant, Demario Thomas, of second degree murder.

Conclusion

For the foregoing reasons, defendant’s conviction and sentence are affirmed.

. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; State v. Tate, 01-1658 (La.05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004).

. State v. Casey, 99-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000); State v. Johnson, 38,927 (La.App.2d Cir. 11/23/04), 887 So.2d 751.